# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRAD AINSLIE, JASON BOYER, CHRISTOPHE CORNAIRE, JOHN KIRLEY, ANGELINA KWAN AND RÉMY SERVANT, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Consol. C.A. No. 9436-VCZ |
| CANTOR FITZGERALD, L.P., a Delaware Limited Partnership, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 27, 2022
Date Decided: January 4, 2023

Blake A. Bennett, COOCH & TAYLOR P.A., Wilmington, Delaware; Joseph Delich, Alex Potter, and Kevin Goode, FREEDMAN NORMAND FRIEDLAND LLP, New York, New York; Kyle Roche, KYLE ROCHE, P.A., New York, New York, *Attorneys for Plaintiffs*.

C. Barr Flinn, Paul J. Loughman, Alberto E. Chávez, Skyler A. Speed, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; David A. Paul, CANTOR FITZGERALD, New York, New York, *Attorneys for Defendant Cantor Fitzgerald, L.P.*

**ZURN, Vice Chancellor.**

Cantor Fitzgerald Limited Partnership ("Cantor Fitzgerald" or the "Partnership") operates under a limited partnership agreement (the "LP Agreement") containing several interlocking provisions designed to restrict former partners from competing, soliciting clients or employees, or using the Partnership's confidential information for four years after the partner leaves. This action has presented the opportunity to categorize and construe those provisions. It has also presented the opportunity to make a choice about what types of provisions constitute restraints of trade that should be evaluated for reasonableness under Delaware law.

The LP Agreement discourages former partners engaging in those competitive activities in two general ways. First, the LP Agreement contains restrictive covenants that prohibit partners from engaging in competitive activities for up to two years (collective the "Restrictive Covenants" and each a "Restrictive Covenant"). During the first year, the partner is bound by a noncompete covenant and several other Restrictive Covenants. During the second year, the noncompete provisions fall away but the nonsolicit remains. A partner will breach a Restrictive Covenant only when the Partnership's Managing General Partner makes the good faith determination that the partner has done so. Cantor Fitzgerald can respond to the violation of a Restrictive Covenant by seeking injunctive relief and damages. This opinion refers to this one- to two-year device as the "Restrictive Covenant

2

Device" and refers to the one- or two-year period in which a partner is bound by a given Restrictive Covenant as the "Restricted Period."

The second means of discouraging competition allows Cantor Fitzgerald to withhold payments otherwise owed from the partner's capital account and some earned compensation. It operates for four years. Cantor Fitzgerald will remit to the partner one fourth of those funds each year, unless the partner engages in any of the same competitive activities. This opinion refers to this four-year device as the "Conditioned Payment Device," and the funds at issue "Conditioned Amounts."

The Conditioned Payment Device is triggered by either of two events: (1) a partner breaches any Restrictive Covenant in the LP Agreement, which this opinion refers to as the "No Breach Condition," and (2) a partner engages in competitive activity for four years, even if doing so is not a breach of any Restrictive Covenant, which this opinion refers to as the "Competitive Activity Condition."

The Competitive Activity Condition and the No Breach Condition have significant—but not complete—overlap. If, for example, during the first two years after leaving, a partner engages in any competitive activity, the Competitive Activity Condition will not occur. But if the Managing General Partner makes a good faith determination that the partner has engaged in a competitive activity, the No Breach Condition will also not occur. In both cases, Cantor Fitzgerald has no duty to pay

3

any of the Conditioned Amounts. After the Restricted Period, i.e., after the Restrictive Covenants expire and the partner is not bound by a promise not to compete, the Competitive Activity Condition will still allow Cantor Fitzgerald to withhold any remaining Conditioned Payments if the partner engages in competitive activity.

In this case, Cantor Fitzgerald withheld Conditioned Payments from six former partners who it determined breached Restrictive Covenants by engaging in competitive activity in the first year after leaving. Cantor Fitzgerald asserts these breaches mean it owes no duty to pay any of the Conditioned Amounts. The six former partners sued to obtain the withheld Conditioned Payments by attacking both the Conditioned Payment Device and the Restrictive Covenant Device as unreasonable restraints of trade. This opinion addresses the parties' cross-motions for summary judgment.

On its face, the primary issue in this case seems simple and sounds in hornbook contract law: whether the Competitive Activity Device operates as a remedy for a breach for a violation of the Restrictive Covenants such that it is a penalty, or if the No Breach and Competitive Activity Conditions are conditions precedent to Cantor Fitzgerald's duty to make the Conditioned Payments. I find that

4

the No Breach Condition and the Competitive Activity Condition are conditions precedent, and not penalty provisions. But this answer raises other questions.

The No Breach Condition was triggered by a breach of the Restrictive Covenants. But for such a breach to occur, the underlying promise must be enforceable—i.e., I cannot find the No Breach Condition was triggered by a breach without finding that the allegedly breached Restrictive Covenants are valid. On review, the Restrictive Covenants are facially overbroad and void against public policy. It follows that they are not valid promises that can give rise to a breach, and so failure to comply with them cannot trigger the No Breach Condition. Thus, the No Breach Condition cannot excuse Cantor Fitzgerald from withholding the Conditioned Amounts.

Cantor Fitzgerald's second attack, relying on the Competitive Activity Condition, fares no better. Unlike the No Breach Condition, the Competitive Activity Condition does not depend on the unenforceable Restrictive Covenants. Nevertheless, it raises an important policy consideration: whether Delaware views contractual provisions requiring former employees to forfeit benefits if they compete as restraints of trade, such that they should be subjected to the same reasonableness analysis our courts apply to traditional noncompetes. Because I answer this question

5

in the affirmative, I find that Cantor Fitzgerald likewise cannot rely on the Competitive Activity Condition as a basis to withhold the Conditioned Amounts.

## I. BACKGROUND

This action was brought against Cantor Fitzgerald by six former Cantor Fitzgerald limited partners—Brad Ainslie, Jason Boyer, Christophe Cornaire, John Kirley, Angelina Kwan, and Rémy Servant (each a "Plaintiff" and collectively, "Plaintiffs").[1] Cantor Fitzgerald "is a global financial services company with a global institutional brokerage business.[2] Each Plaintiff is a former employee of nonparty Cantor Fitzgerald Hong Kong Limited ("Cantor Fitzgerald Hong Kong"), a wholesale brokerage business.[3] Each Plaintiff voluntarily terminated his or her employment with Cantor Fitzgerald Hong Kong and withdrew from Cantor Fitzgerald.

Cantor Fitzgerald is a limited partnership formed under the Delaware Limited Partnership Act and managed by its Managing General Partner.[4] To become Cantor Fitzgerald partners, Plaintiffs signed Cantor Fitzgerald's LP Agreement, which

---

[1] Docket Item ("D.I.") 31 ¶¶ 2, 7–12 [hereinafter "Am. Compl."].

[2] D.I. 121 at 40 [hereinafter "DOB"].

[3] D.I. 34 ¶ 1; D.I. 125 at 13 [hereinafter "PCB"].

[4] DOB at Ex. 6 § 1.04 [hereinafter, "LP Agr."]; *id.* § 1.01 (defining "Act"); *id.* § 3.01(a). Cantor Fitzgerald's Managing General Partner is an entity called CF Group Management, Inc. DOB at 6; LP Agr. § 1.01 (defining "Managing General Partner").

bound each Plaintiff at the time of they withdrew.  The LP Agreement contains two devices for discouraging and prohibiting competition after a partner leaves:  the Restrictive Covenant Device and the Conditioned Payment Device.

### A. The Restrictive Covenant Device

Through the Restrictive Covenant Device, partners promise not to compete against, solicit employees or customers from, or otherwise harm Cantor Fitzgerald for one to two years after they leave.[5]  Section 3.05 of the LP Agreement defines "Partner Obligations" to include the obligation to refrain from engaging in "Competitive Activities" during the time one is a partner and for the "Restricted Period," which lasts for one to two years after withdrawal from the Partnership, depending on the activity.[6]  A partner engages in a Competitive Activity if, as defined in Section 11.04(c), she:

> (A) directly or indirectly, or by action in concert with others, solicits, induces, or influences, or attempts to solicit, induce or influence, any other partner, employee or consultant of the Partnership or any Affiliated Entity to terminate their employment or other business arrangements with the Partnership or any Affiliated Entity, or to engage in any Competing Business (as hereinafter defined) or hires, employs, engages (including as a consultant or partner) or otherwise enters into a Competing Business with any such Person,

---

[5] *Id.* §§ 3.05(a)(ii)–(iii); *id.* § 1.01 (defining "Restricted Period" for activities in Sections 3.05(a)(ii) and (iii) as two years and one year, respectively).

[6] *Id.*  Despite defining this term as "Competitive Activities," the LP Agreement refers to each activity as a "Competitive Activity."  I do the same.

(B) solicits any of the customers of the Partnership or any Affiliated Entity (or any other employees), induces such customers or their employees to reduce their volume of business with, terminate their relationship with or otherwise adversely affect their relationship with, the Partnership or any Affiliated Entity,

(C) does business with any person who was a customer of the Partnership or any Affiliated Entity during the twelve-month period prior to a Partner becoming a Terminated or Bankrupt Partner if such business would constitute a Competing Business,

(D) directly or indirectly engages in, represents in any way, or is connected with, any Competing Business, directly competing with the business of the Partnership or of any Affiliated Entity, whether such engagement shall be as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business, or

(E) assists others in engaging in any Competing Business in the manner described in the foregoing clause (D).[7]

The Restricted Period for subsection (A) ends two years after the partner withdraws, and after one year for subsections (B) through (E).[8] Section 3.05(a) further provides that partners may not, during their time as partners and for one year after withdrawing, "take any action that results directly or indirectly in revenues or other benefit for that Limited Partner or any third party that is or could be considered to be engaged in such Competitive Activity."[9]

The LP Agreement defines a "Competing Business" as follows:

---

[7] *Id.* § 11.04(c) (defining "Competitive Activities"); *id.* §§ 3.05(a)(ii)–(iii).

[8] *Id.* §§ 3.05(a)(ii)–(iii); *id.* § 1.01 (defining "Restricted Period" for activities in Sections 3.05(a)(ii) and (iii) as two years and one year, respectively).

[9] *Id.* § 3.05(a)(iii).

[A business that] (i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was engaged in by the Partnership or an Affiliated Entity or the Partnership or such Affiliated Entity took substantial steps in anticipation of commencing such business prior to the date on which such Partner ceases to be a Partner.[10]

"Affiliated Entities" are "the limited and general partnerships, corporations or other entities owned, controlled by or under common control with the Partnership."[11]

Under Section 3.05, the Managing General Partner has "sole and absolute discretion" to make a good faith determination that a partner has breached a Partner Obligation, including by engaging in a Competitive Activity during the Restricted Period, and that determination is "final and binding."[12] Section 3.05 also recognizes that Cantor Fitzgerald could obtain injunctive relief preventing the ongoing breach of a Partner Obligation, including engaging in any Competitive Activity during the Restricted Period.[13]

---

[10] *Id.* § 11.04(c)(E).

[11] *Id.* §1.01 (defining "Affiliated Entities").

[12] *Id.* § 3.05(a)(vi).

[13] *See* § 3.05(b) (stating that withholding Additional Amounts is "in addition to any other rights or remedies the Managing General Partner may have").

## B.    The Conditioned Payment Device

The Conditioned Payment Device is built on the fact that the Partnership maintains a capital account for and owes compensation to each partner that, by default, will be repaid to that partner in annual installments over the four years following withdrawal.[14]  But if the partner competes at any time during those four years, the Conditioned Payment Device is triggered and Cantor Fitzgerald will not repay any remaining amounts otherwise owed.

Each partner's capital account reflects her capital contributions, including contributions for purchasing High Distribution Units II ("HDII Units)," and each partner's profit share.[15]  Any distributions and loss share are subtracted from the account.[16]  Each partner also has an "Adjusted Capital Account," which has a value equal to the capital account without regard to certain regulations and adjustments.[17] Five of the six Plaintiffs had purchased and were holding HDII Units at the time they withdrew.[18]

---

[14] *Id.* §§ 11.04(a), 11.08(b), 11.09(b), 11.10(b).  Generally, awards of Grant Units, Matching Grant Units and GP Units are not credited to a partner's capital account. *Id.* § 6.01(e).

[15] *Id.* § 6.02(b).

[16] *Id.*

[17] *Id.* § 1.01 (defining "Adjusted Capital Account").

[18] PCB, Ex. 13 (showing Ainslie, Boyer, Cornaire, Kwan, Servant as having purchased HDII Units); DOB, Ex. 10, at res. 14 (stating amount of each Plaintiff's cash contribution).

Within ninety days of termination, a withdrawing partner is entitled to an initial payment consisting of a portion of her capital account, referred to as the "Base Amount."[19]   The remaining difference between a partner's Base Amount and Adjusted Capital Account (the "Additional Amount") is paid out "[o]n each of the first, second, third and fourth anniversaries" of the Base Amount payment date.[20]

In addition to purchasing HDII Units, Cantor Fitzgerald partners can earn Partnership units referred to by the LP Agreement as Grant Units and Matching Grant Units as a form of compensation.[21]  Sections 11.08, 11.09, and 11.10 govern post-termination payments to Grant Unitholders, Matching Grant Unitholders, and grant tax accounts (the "Grant Amounts").[22]   The LP Agreement provides for payment of Grant Amounts in four equal installments over four years.[23]

The Conditioned Payment Device attaches to the payments of the Additional Amount and Grant Amounts (together, the "Conditioned Amounts") per Article XI

---

[19] LP Agr. § 11.03(c)(ii).

[20] *Id.* § 11.04(a).

[21] *See id.* § 6.01(a) (providing that each partner "has made a cash contribution to the capital of the Partnership", but "Grant Units, Matching Grant Units and GP Units shall not require a cash contribution"); *id.* § 5.02; DOB, Ex. 20, at 41 ("[A grant unit is] a unit that was given to an employee who didn't purchase it.").

[22] Although the record is unclear as to whether Plaintiffs hold any interest in a grant tax payment account, they nevertheless argue that they are entitled to payments under this provision.  PCB at 2, 17 (citing LP Agr. § 11.09).

[23] LP Agr. §§ 11.08(b), 11.09(b), 11.10(b).

of the LP Agreement. In so many words, if a partner engages in a Competitive Activity within four years after withdrawing from the Partnership, the Conditioned Payment Device is triggered and Cantor Fitzgerald will not pay that partner any remaining Conditioned Amounts.[24] As to Grant Amounts, Cantor Fitzgerald is not obligated to make any remaining payments if the partner has engaged in a Competitive Activity.[25] For Additional Amounts, Cantor Fitzgerald is not obligated to make any payments if the partner has "engaged in any Competitive Activity or otherwise breached a Partner Obligation prior to the date such payment is due."[26] This opinion refers to the Conditioned Payment Device's trigger by engaging in Competitive Activity as the "Competitive Activity Condition," and the trigger by a breach of a Partner Obligation as the "No Breach Condition."

Section 11.02 states that "[n]othing in this Article XI shall be considered or interpreted as restricting the ability of a former Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever."[27] The

---

[24] *See id.* § 11.02(d).

[25] *Id.* §§ 11.08(b), 11.09(b), 11.10(b).

[26] *Id.* § 11.04(a).

[27] *Id.* § 11.02(c).

12

Conditioned Payment Device applies regardless of the reason a partner ceases to become a partner.[28]

### C. The Relationship Between The Restrictive Covenant Device And The Conditioned Payment Device

The Conditioned Payment Device has some overlap with the Restrictive Covenant Device. The No Breach Condition for Additional Amounts is triggered if the Managing General Partner determines that a partner has breached any of the Partner Obligations.[29] Section 3.05, which includes the Restrictive Covenants, provides that if a Restrictive Covenant is breached, the breaching partner "shall have no right to receive any further distributions . . . including any Additional Amounts or other distributions or payments of cash, stock, or property, to which such Partner otherwise might be entitled."[30] Section 3.05(b) explains that "any Limited Partner that breaches any Partner Obligation shall be subject to all of the consequences

---

[28] *Id.* § 11.04(c).

[29] *Id.* § 11.04(a) (conditioning payment of Additional Amounts on partners not breaching Partner Obligations); *id.* § 3.05(a)(vi) (stating that whether a partner has breached a Partner Obligation is determined by the Managing General Partner).

[30] *Id.* § 3.05(b). Section 3.05 also provides that the breaching partner must pay Cantor Fitzgerald's attorneys' fees and expenses, "as well as any damages resulting from such breach. *Id.*

(including, without limitation, the consequences provided for in Articles XI and XII) applicable to a Limited Partner that engages in a Competitive Activity."[31]

The Restrictive Covenant Device and No Breach Condition are triggered if the Managing General Partner, in its "sole and absolute discretion," makes the "final and binding" good faith determination that "a Limited Partner has breached its Partner Obligations."[32] In contrast, the Conditioned Payment Device is triggered by "engaging in Competitive Activity"—full stop. That is, whether or not a partner has breached a Partner Obligation is determined by the Managing General Partner, but whether a partner has engaged in Competitive Activity after the Restricted Period is not.

For both Additional Amounts and Grant Amounts, the Conditioned Payment Device's Competitive Activity Condition lasts longer than the Restrictive Covenant Device. The Competitive Activity Condition lasts for four years, not just one or two: a withdrawing partner forfeits some or all of the Additional Amounts and Grant Amounts owed if she engages in any Competitive Activity for four years following her withdrawal.[33]

---

[31] *Id.* § 3.05(b).

[32] *Id.* § 3.05(a)(vi).

[33] *Id.* § 11.02(d).

14

### D. Other Relevant Provisions

Several other provisions of the LP Agreement operate in the background of this case. Section 11.12 provides that "[t]he Managing General Partner, . . . may condition the payment of any amounts due to a Partner under this Article XI upon obtaining a release from such Partner . . . from all claims against the Partnership other than claims for payment pursuant to . . . Article XI."[34] Section 20.01 is a forum selection provision providing that disputes "arising under [the] Agreement shall" be litigated in Delaware, except that Cantor Fitzgerald has the discretion to require that disputes be litigated elsewhere or in arbitration.[35] The LP Agreement also includes a severance provision.[36]

### E. The Plaintiffs Withdraw From The Partnership, And Cantor Fitzgerald Does Not Make Payments.

All six Plaintiffs voluntarily withdrew from the Partnership between 2010 and 2011.[37] Within a year of their respective departures, Cantor Fitzgerald's Managing General Partner determined each Plaintiff breached a Partner Obligation by accepting employment or otherwise performing services on behalf of a Competing

---

[34] *Id.* § 11.12.

[35] *Id.* § 20.01(a).

[36] *Id.* § 20.11.

[37] Am. Compl. ¶¶ 16, 18, 20, 22, 24, 26.

Business.[38]  And so, Cantor Fitzgerald did not remit them any Additional Amounts or Grant Amounts.[39]

In addition, Cantor Fitzgerald did not pay Ainslie his Base Amount because Ainslie declined to sign a release the Managing General Partner requested under Section 11.12.[40]  Boyer, Cornaire, Kirley, Kwan, and Servant do not contend that Cantor Fitzgerald wrongfully withheld their Base Amounts.[41]

Cantor Fitzgerald stated in its interrogatory responses that "had [Plaintiffs] not engaged in Competitive Activities and breached the [LP Agreement] following their terminations, and had they complied with Section 11.12" by signing any requested releases, they would have received the following amounts:[42]

---

[38] DOB at 29, 41; PCB at 15–16, 32–33; *see also, e.g.*, PCB, Ex. 4 at RF_0034338; PCB, Ex. 8.

[39] *See* DOB, Ex. 7, at res. 8.

[40] DOB, Ex. 19; *see* PCB at 56–58.

[41] The record does not clearly reflect whether any actual sums were paid to these Plaintiffs as Base Amounts or whether those amounts were set off against other debts or obligations. *See* DOB, Ex. 7 at res. 8.

[42] *Id.*

| Plaintiff | Base Amount | Additional Amounts | Grant Amounts[43] | Total |
|---|---|---|---|---|
| Ainslie, Brad | $ 350,749.42 | $ 644,025.37 | $ 458,248.75 | $ 1,453,023.54 |
| Boyer, Jason | $ 0 | $ 2,219,387.95 | $ 3,272,704.50 | $ 5,492,092.45 |
| Cornaire, Christophe | $ 0 | $ 893,864.40 | $ 750,000.00 | $ 1,643,864.40 |
| Kirley, John | $ 0 | $ 11,645.00 | $ 85,006.00 | $ 96,651.00 |
| Kwan, Angelina | $ 0 | $ 321,721.15 | $ 12,798.74 | $ 334,519.89 |
| Servant, Rémy | $ 0 | $ 42,173.50 | $ 159,005.50 | $ 201,179.00 |

### F.     Litigation Begins In Hong Kong.

After Plaintiffs' departures, Cantor Fitzgerald Hong Kong and nonparty Cantor Fitzgerald Europe sued Ainslie and Boyer, as well as two nonparties to this case, in a Hong Kong court seeking "injunctive relief and repayment of loan obligations."[44] The Cantor entities alleged Ainslie and Boyer violated the terms of restrictive covenants in an employment agreement they had with Cantor Fitzgerald Hong Kong.[45] The court denied the request for an injunction.[46] In doing so, the court concluded that the noncompete in Cantor Fitzgerald Hong Kong's employment agreement was unenforceable under Hong Kong law.[47]

---

[43] Cantor Fitzgerald's interrogatory responses did not specify whether these "Grant Amounts" reflect the former ownership of Grant Units, Matching Grant Units, or some interest in Grant Tax Payment Accounts.

[44] DI. 133 at 29–30 [hereinafter "DCB"]; PCB at 35–36; DOB at 3.

[45] PCB at 35–36; DCB at 3.

[46] PCB at 35–36; DCB at 3.

[47] *See* PCB at 2.

17

### G. This Litigation

Plaintiffs filed an amended consolidated complaint (the "Amended Complaint") in this action on October 4, 2016.[48] After years of fits and starts, the parties have completed fact discovery,[49] and a trial is scheduled to begin on May 8, 2023.[50]

The Amended Complaint asserts twelve causes of action. The first six, one for each Plaintiff, assert various claims for breach of contract against Cantor Fitzgerald.[51] Among those are claims that Cantor Fitzgerald breached the LP Agreement by failing to pay Additional Amounts and Grant Amounts to Plaintiffs.[52] In Counts Seven through Twelve, each Plaintiff seeks a declaration as to the amounts owed to him or her, as well as a declaration that "the four-year non-compete provision imposed by [the Conditioned Payment Device] is not appropriately limited

---

[48] Am. Compl. The original complaint in this action was not joined by Kwan, who filed a separate complaint in a separate action. C.A. No. 10089-VCL, D.I. 1. The Court granted a stipulation to consolidate the two actions on June 10, 2016. D.I. 30. That original complaint was also joined by Pierre-Henri Mallez, another former limited partner, but the parties stipulated to Mallez's dismissal from this case on October 15, 2014. D.I. 1 ¶ 11; D.I. 12.

[49] *See* DOB at 5–6.

[50] D.I. 130 ¶ 1(m).

[51] Am. Compl. ¶¶ 40–73. Plaintiffs Boyer, Cornaire, Kirley, and Servant asserted certain tax claims, all of which have since been dismissed by this Court. D.I. 118.

[52] Am. Compl. ¶¶ 42, 47, 53, 59, 65, 70.

in time or space, fails to protect a legitimate interest of CFLP, and is oppressive," and is therefore unenforceable.[53]

On March 31, 2022, Cantor Fitzgerald moved for summary judgment on all twelve counts under Court of Chancery Rule 56.[54] As to Counts One through Six, Cantor Fitzgerald argues that all Plaintiffs engaged in Competitive Activities, which resulted in breaches of Partner Obligations, and therefore triggered both the No Breach Condition and the Competitive Activity Condition.[55] Cantor Fitzgerald also argues the Conditioned Payment Device should be enforced as a matter of public policy and that Delaware should follow what is known as the employee choice doctrine.[56] As to Ainslie, Cantor Fitzgerald argues he is not entitled to his Base Amount because he failed to sign a release.[57] Regarding Counts Seven through Twelve, Cantor Fitzgerald argues that they are duplicative of Counts One through Six, moot, and fail on their merits because the underlying provisions are not noncompete agreements.[58] Cantor Fitzgerald emphasizes it is not seeking and has

---

[53] *Id.* ¶¶ 74–93.

[54] D.I. 120.

[55] DOB at 24–31.

[56] *Id.* at 34–36.

[57] *Id.* at 31.

[58] *Id.* at 36–44.

not sought to enforce any Restrictive Covenant by actually prohibiting competition, and that it only is invoking the Conditioned Payment Device.

On May 10, Plaintiffs opposed Cantor Fitzgerald's motion and filed a cross-motion of their own. Plaintiffs primarily argue that the Restrictive Covenant Device and the Conditioned Payment Device are both restraints of trade, and should be evaluated as such.[59] This opinion also reaches Plaintiffs' arguments that the Conditioned Payment Device is an unenforceable damages provision that is enforcing void restrictive covenants,[60] and that Cantor Fitzgerald's request that Ainslie sign a release was unreasonable, and therefore Cantor Fitzgerald is not entitled to summary judgment on that basis.[61] Plaintiffs conclude they are entitled to summary judgment on their declaratory judgment claims for the same reasons.[62]

---

[59] PCB at 18–23.

[60] *Id.* at 31–33.

[61] *Id.* at 57–58. Plaintiffs also argue that issue and claim preclusion bars Cantor Fitzgerald from raising certain issues of law and questions of fact in light of prior litigation in Hong Kong involving Ainslie, Boyer, and two entities apparently affiliated with Cantor Fitzgerald. *Id.* at 38–41. For reasons that are explained later in this opinion, I do not reach this argument. Because Plaintiffs prevail on striking the Conditioned Payment Device as unenforceable, I also do not reach their argument that there is a genuine issue of material fact as to whether they actually engaged in Competitive Activity.

[62] *Id.* at 58.

20

The parties briefed the cross-motions,[63] and I heard oral argument on October 7, 2022.[64]

## II.   ANALYSIS

This Court will grant a motion for summary judgment where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.[65]   In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that no material question of fact exists.[66]   Where "the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[67]   Summary judgment is appropriate here because there is no material dispute of fact.[68]

---

[63] DCB; D.I. 133 [hereinafter "PRB"].

[64] D.I. 135; D.I. 136.

[65] Ct. Ch. R. 56(c).

[66] *Weil v. VEREIT Operating P'ship, L.P.*, 2018 WL 834428, at *3 (Del. Ch. Feb. 13, 2018).

[67] Ct. Ch. R. 56(h).

[68] The parties dispute whether Plaintiffs actually engaged in Competitive Activity, whether the Managing General Partner made its determination that Plaintiffs breached a Partner Obligation in good faith, and whether Cornaire is a "good leaver."  Because I do not reach these issues, these disputes are not material, and so they do not preclude summary

21

Limited partnership agreements are contracts.[69] Delaware follows the objective theory of contracts, meaning "a contract's construction should be that which would be understood by an objective, reasonable third party."[70] Accordingly, Delaware courts read contracts as a whole, and interpret contracts with the goal of effectuating the parties' intent.[71] "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[72] The Court "will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[73]

judgment. *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1175 (Del. 2012) ("Factual disputes that are immaterial as a matter of law will not preclude summary judgment.").

[69] *AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *12 (Del. Ch. Apr. 14, 2022) ("Delaware courts apply rules of contract interpretation to limited partnership agreements." (internal quotation marks omitted) (quoting *Cantera v. Marriott Senior Living Servs., Inc.*, 1999 WL 118823, at *3 (Del. Ch. Feb. 18, 1999))).

[70] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks omitted) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[71] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 2010 WL 779992, *2 (Del. Mar. 8, 2010)).

[72] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (internal quotation marks omitted) (quoting *Osborn*, 991 A.2d at 1159–60).

[73] *See Osborn*, 991 A.2d at 1159 (internal quotation marks omitted) (quoting *Kuhn*, 2010 WL 779992, *2).

Some of the relevant promises in the LP Agreement inspire special consideration under Delaware law: the Restrictive Covenants in Section 3.05. Delaware courts do not mechanically enforce noncompete or nonsolicit agreements.[74] And they make no exception for restrictive covenants in the partnership setting.[75] "[A]greements not to compete must be closely scrutinized as restrictive of trade."[76] Delaware courts "carefully review" noncompete and nonsolicit agreements to ensure that they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[77] "Delaware courts have favored the public interest of competition in their review of noncompetition agreements."[78] "Where noncompete or nonsolicitation agreements

---

[74] *E.g.*, *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) (citing *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987)).

[75] *KPMG Peat Marwick LLP v. Fernandez*, 709 A.2d 1160 (Del. Ch. 1998) (noting Delaware law requires analyzing a former partner's agreement not to compete for whether its "purpose and reasonable operation is to protect the legitimate interests of the former employer"); *see, e.g.*, *Deloitte & Touche USA LLP v. Lamela*, 2005 WL 2810719 (Del. Ch. Oct. 21, 2005).

[76] *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977).

[77] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (internal quotation marks omitted) (quoting *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018)).

[78] *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2005) (citing *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *15 (Del. Ch. Apr. 15, 2004)).

are unreasonable in part, Delaware courts are hesitant to 'blue pencil' such agreements to make them reasonable."[79]  This is so even where an agreement includes a provision providing that unenforceable contractual terms should be revised as necessary to render them enforceable.[80]

Against that backdrop, the parties joined issue on the doctrinal label to be assigned to the Conditioned Payment Device.  Plaintiffs contend the Conditioned Payment Device, as triggered by the No Breach Condition and as implemented in Sections 3.05 and 11.04(a), is an unenforceable damages provision for breach of the Restrictive Covenants.  They also contend the Conditioned Payment Device as implemented in Article XI against the Additional Amounts and Grant Amounts is a restraint of trade and void as against public policy.

Cantor Fitzgerald posits that the Conditioned Payment Device is confined to Article XI, and merely conditions its duty to pay the Conditioned Amounts.  Cantor Fitzgerald insists the Restrictive Covenants are relevant only insofar as they define the No Breach Condition.  That is, in Cantor Fitzgerald's view, it is not seeking to enforce the Restrictive Covenants per se.  Rather, it is enforcing the standalone No Breach Condition (which is triggered by a breach of the Restrictive Covenants) as

---

[79] *Kodiak Bldg. P'rs, LLC v. Adams*, 2022 WL 5240507, at *4 (Del. Ch. Oct. 6, 2022).

[80] *See id.* at *4 n.49.

to the Additional Amounts, and the standalone Competitive Activity Condition as to all Conditioned Amounts. Cantor Fitzgerald presses that this Court should enforce both the No Breach Condition and the Competitive Activity Condition just as any other contractual provision, without any public policy review.

Identifying the Conditioned Payment Device as a damages provision or a condition informs whether and how this Court may evaluate any restraint of trade for reasonableness. If it is a damages provision enforcing a promise not to compete, or a condition triggered by breaching a promise not to compete, the underlying promise must be enforceable: accordingly, the Court may (and must) evaluate the underlying Restrictive Covenants for reasonableness. If the Conditioned Payment Device is a condition standing alone from any promise not to compete, but nevertheless imposing financial consequences if the partners compete, the Court must make a public policy determination as to whether the condition alone restrains trade and so should be evaluated for reasonableness. A brief description of the various proffered contractual labels may serve readers well.

## A. A Primer On Promises, Breaches, Liquidated Damages And Penalty Provisions, And Conditions

Generally speaking, contracts involve the exchange of promises.[81] "A 'promise' is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."[82] If a promise creates a legal duty to act, then the failure to fulfill that promise will result in a breach of contract.[83] In the event of a breach, the law of contract endeavors to restore the nonbreaching party to the position she would have been in but for the breach, and compensate the nonbreaching party for her loss.[84]

---

[81] 1 Williston on Contracts § 1:4 (4th ed.) [hereinafter "*Williston on Contracts*"] ("A 'bargain' is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances. The Restatement Second adds the possibility that a bargain may be struck upon an agreement to exchange performances, which seems appropriate." (footnote omitted)).

[82] *Williston on Contracts* § 1:2; Restatement (Second) of Contracts § 2(1) (Am. L. Inst. 1981) [hereinafter "Restatement (Second) of Contracts"]; *accord Promise*, Black's Law Dictionary (11th ed. 2019).

[83] *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) ("It is thus more accurate to describe the elements of a claim for breach of contract as '(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance.'" (quoting *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021))); *see also Weiss v. Nw. Broad. Inc.*, 140 F. Supp. 2d 336, 346 (D. Del. 2001) ("The non-fulfillment of a promise is called a breach of contract, and creates in the other party a secondary right to damages; it is the failure to perform that which was required by a legal duty." (internal quotation marks omitted) (quoting *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 94 A.D.2d 947, 947 (N.Y. App. Div. 1983))).

[84] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 747 (Del. Ch. 2008) ("It is a fundamental proposition of contract law that damages in contract are solely to give

But not all breaches are equal, and the law's response to a breach hinges on the breach's materiality. An immaterial breach exposes the breaching party to damages, but the counterparty must still perform.[85] A material breach entitles the nonbreaching party to damages and relieves it of its obligations to perform under the agreement.[86] "A 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose

---

the non-breaching party the 'benefit of the bargain,' and not to punish the breaching party." (citing *Williston on Contracts* § 64:1)); *Williston on Contracts* § 64:1 ("The fundamental principle that underlies the availability of contract damages is that of compensation."); 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.08 at 12-68–69 (4th ed. 2019) [hereinafter "*Farnsworth on Contracts*"] ("[N]o matter how reprehensible the breach, damages are generally limited to those required to compensate the injured party for lost expectation, for it is a fundamental tenet of the law of contract remedies, that the injured party should not be put in a better position than had the contract been performed.").

[85] *Williston on Contracts* § 63:3.

[86] *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013) ("The party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform."); *Carey v. Est. of Myers*, 2015 WL 4087056, at *20 (Del. Super. July 1, 2015) ("Material breach acts as a termination of the contract going forward, abrogating any further obligations to perform by the non-breaching party."). The non-breaching party can, of course, waive the right to discharge its obligation by continuing to perform, and doing so will not waive its right to damages for the breach. *Williams Cos., Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *14 (Del. Ch. July 2, 2020) ("Faced with a material breach of a contract, a non-breaching party has two options: it may choose to cease performance, or it may continue performance of the contract. Continuing performance waives the argument that the waiving party's performance obligation was discharged, but it does not waive recovery for the material breach.").

27

of the contract or makes it impossible for the other party to perform under the contract."[87]

But contractual parties may contract to excuse a party's duty to perform for something less than a material breach by conditioning that duty on the occurrence of a condition precedent or the nonoccurrence of a condition subsequent.[88] Where the parties have created a condition precedent, the occurrence of that condition is necessary to give rise to the other party's duty to perform; if the condition does not occur, the duty never arises.[89] A condition subsequent is an event that discharges a party from a preexisting duty to perform immediately; the occurrence of the condition extinguishes that duty.[90] Such conditions can take the form of either

---

[87] *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (internal quotation marks and emphasis omitted) (quoting *Shore Invs., Inc. v. Bhole, Inc.*, 2011 WL 5967253, at *5 (Del. Super. Nov. 28, 2011)); *see also* Restatement (Second) of Contracts § 241 (providing factors for determining whether a breach is material).

[88] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *85 (Del. Ch. Oct. 1, 2018) (collecting authorities)).

[89] *Williston on Contracts* § 38:7 ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises." (footnote omitted)); Restatement (Second) of Contracts § 224 ("A condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due."); *Summit Invs. II, L.P. v. Sechrist Indus., Inc.*, 2002 WL 31260989, at *7 (Del. Ch. Sept. 20, 2002) ("Conditions are events that must occur before a party becomes obligated to perform.").

[90] *Williston on Contracts* § 38:9 ("A condition subsequent has been defined as a future event, the happening of which discharges the parties from their otherwise binding agreement."); *id.* ("The term 'condition subsequent,' as normally used in contracts in contrast to 'condition precedent,' should mean an event which occurs subsequent to a duty

performance or an event.[91]   The nonoccurrence of a condition precedent or the occurrence of a condition subsequent is not itself a breach.[92]  Whether the agreement establishes a condition is a question of intent to be drawn from the agreement's plain, unambiguous language.[93]  Words and phrases such as "if," "provided that," and "on the condition that" generally indicate the parties have created a condition.[94]

---

of immediate performance, that is, a condition which divests a duty of immediate performance of a contract after it has once accrued and become absolute."); Restatement (Second) of Contracts § 230(1) ("[I]f under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance or one to pay damages for breach, that duty is discharged if the event occurs."); *SLMSoft.com, Inc. v. Cross Country Bank*, 2003 WL 1769770, at *12 (Del. Super. Apr. 2, 2003) ("A term rendering performance by one party contingent upon a condition or performance of another is generally a condition precedent.  This condition 'must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies.'" (quoting *Williston on Contracts* § 38:7, and citing *Marvel v. Conte*, 1978 WL 8409, at *4 (Del. Ch. Oct. 24, 1978))).

[91] *Williston on Contracts* § 38:7 ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises." (footnote omitted)).

[92] *See Supernus Pharms., Inc. v. Reich Consulting Grp., Inc.*, 2021 WL 5046713, at *6 (Del. Ch. Oct. 29, 2021) ("[N]onperformance of a condition precedent is not a breach of contract since the purpose of the condition is merely to qualify the duty to perform immediately." (internal quotation marks omitted) (quoting *Williston on Contracts* § 63:6)).

[93] *SLMSoft.com*, 2003 WL 1769770, at *12; Restatement (Second) of Contracts § 226 cmt. a.  The Restatement contrasts events to conditions.  *See id.* § 226.

[94] *SLMSoft.com*, 2003 WL 1769770, at *12; *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *8 (Del. Ch. Nov. 30, 2017); *Sage Software, Inc. v. CA, Inc.*, 2010 WL 5121961, at *8 (Del. Ch. Dec. 14, 2010); *Kan. City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *3 (Del. Ch. Nov. 4, 2003); *see also* Restatement (Second) of Contracts § 226 cmt. a ("No particular form of language is necessary to make an event a condition, although such words as 'on condition that,' 'provided that' and 'if' are often used for this purpose.").

Delaware law offers two steps to categorize a condition.[95] Courts should first "look to the nature of the condition at issue."[96] "If the condition must be satisfied before a duty of performance arises," the parties have created a condition precedent; if the event in question extinguishes an immediate duty of performance, the parties have created a condition subsequent.[97] If it is still unclear whether the parties created a condition precedent or condition subsequent, this Court has suggested a three factor test, as enumerated in the mergers and acquisitions context: "(i) whether the condition turns on a specific and easily verified fact, such as the receipt of regulatory clearance or a favorable stockholder approval, (ii) whether the condition turns on a departure from what normally would occur between signing and closing, and (iii) which party would have to prove a negative."[98]

Conditions risk imposing a forfeiture on the party who loses the benefit of the other party's performance.[99] "Forfeiture" is generally "the denial of compensation

---

[95] *See AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *49–50 (Del. Ch. Nov. 30, 2020) ("[P]arties and courts can promote clarity by starting with the Restatement approach and asking explicitly whether the condition is one that must be satisfied before an obligation to perform arises or whether the condition extinguishes an existing obligation to perform." (citing Restatement (Second) of Contracts § 224 cmt. e and *Hexion*, 965 A.2d at 739.

[96] *AB Stable*, 2020 WL 7024929, at *49.

[97] *Id.*

[98] *Id.* at *50.

[99] Restatement (Second) of Contracts § 227 cmt. b ("The non-occurrence of a condition of an obligor's duty may cause the obligee to lose his right to the agreed exchange after he

30

that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange."[100] Because of the risk of forfeiture, conditions are disfavored and the law has evolved to protect parties from forfeitures in certain instances.[101] Pursuant

---

has relied substantially on the expectation of that exchange, as by preparation or performance. The word 'forfeiture' is used in this Restatement to refer to the denial of compensation that results in such a case.").

[100] *Id.* § 229 cmt. b; *accord Williston on Contracts* § 42:1 ("[T]he word 'forfeiture' implies the loss of something previously owned, or at least the prevention from acquiring something for which one has substantially paid" (footnote omitted)); *Nw. Cent. Pipeline Corp. v. Mesa Petroleum Co.*, 1985 WL 44696, at *4 (Del. Ch. Apr. 10, 1985) ("A forfeiture is generally understood as a deprivation of rights or property as a result of the nonperformance of some obligation or condition."); Restatement (Second) of Contracts § 227 cmt. b ("The non-occurrence of a condition of an obligor's duty may cause the obligee to lose his right to the agreed exchange after he has relied substantially on the expectation of that exchange, as by preparation or performance. The word 'forfeiture' is used in this Restatement to refer to the denial of compensation that results in such a case."); *see also Forfeiture*, Black's Law Dictionary (11th ed. 2019) ("A destruction or deprivation of some estate or right because of the failure to perform some contractual obligation or condition.").

[101] *See, e.g.*, *Snow Phipps Grp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) ("The prevention doctrine provides that 'where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'" (citation omitted)); *Eisenmann Corp. v. Gen. Motors Corp.*, 2000 WL 140781, at *18 n.16 (Del. Super. Jan. 28, 2000) ("[T]he Court may excuse the nonoccurrence of a condition that would cause a disproportionate forfeiture unless its occurrence was a material part of the agreed Exchange." (citing Restatement (Second) of Contracts § 229)); *Jefferson Chem. Co. v. Mobay Chem. Co.*, 267 A.2d 635, 637 (Del. Ch. 1970) (excusing forfeiture resulting from "technical mistake"); *see also Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 68 (Del. 2022) ("Except as stated in §§ 198 and 199, a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy unless denial of restitution would cause disproportionate forfeiture." (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 197)).

to one such protection, "[i]f the [agreement's] language does not clearly provide for a forfeiture, then a court will construe the agreement to avoid causing one."[102] Nevertheless, the Court will find the parties created a condition resulting in a forfeiture if the language reflects an unambiguous intent to do so.[103] In considering the presence of a condition, as in all contract interpretation exercises, the Court must read the contract as a whole.[104]

While the law of forfeitures protects a nonbreaching party from losing the benefit of her bargain, the law of penalties and liquidated damages protects the breaching party from undue punishment. As stated, the purpose of damages in

---

[102] *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco,* LLC, 2022 WL 34688, at *15–16 (Del. Ch. Jan. 4, 2022); *see also* Restatement (Second) of Contracts § 227(1) ("In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.").

[103] *Williston on Contracts* § 38:12 ("Although the court may regret the harshness of an express condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties unless doing so will violate public policy." (footnote omitted)); Restatement (Second) of Contracts § 227 cmt. b ("The policy favoring freedom of contract requires that, within broad limits (see § 229), the agreement of the parties should be honored even though forfeiture results."); *Hindman v. Salt Pond Assocs.*, 1992 WL 396304, at *4 (Del. Ch. Dec. 21, 1992) ("As to the legality of forfeiture provisions, 'a forfeiture provision incorporated in a partnership agreement may be given effect.'" (internal quotation marks omitted) (quoting 68 C.J.S. Partnership § 86 (1950))).

[104] *Headlands Tech*, 2020 WL 5946962, at *5 (looking to other parts of an agreement to determine if particular language is a condition); *QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *7 (Del. Ch. Aug. 28, 2018) (looking to an agreement "as a whole and in context" to avoid a forfeiture).

contract law is to compensate a party for her loss—not to punish the breaching party.[105] It follows that Delaware courts generally will not enforce provisions that require the breaching party to pay a preset amount untethered to the nonbreaching party's actual damages.[106] A penalty provision punishes a party for breaching or otherwise attempting to coerce that party into performing "by making a breach so expensive that it forces adherence to the contract."[107] At common law, penalty provisions are void as against public policy.[108]

---

[105] *See supra* note 84.

[106] *See CRS Proppants LLC v. Preferred Resin Hldg. Co., LLC*, 2016 WL 6094167, at *4 (Del. Super. Sept. 27, 2016) ("Generally, a fixed amount regardless of the breach is considered intent to impose a penalty."); *Lyons Ins. Agency, Inc. v. Wark*, 2020 WL 429114, at *1 (Del. Ch. Jan. 28, 2020); *S.H. Deliveries, Inc. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at *2 (Del. Super. May 21, 1997)); *see also Williston on Contracts* § 42:1; Restatement (Second) of Contracts § 356 cmt. c.

[107] *Williston on Contracts* § 65:3; *id.* § 42:1 ("A penalty, as distinguished from a forfeiture, therefore, involves the enforcement of an obligation to pay an amount fixed by law or agreement of the parties as a punishment for the failure to fulfill some primary obligation."); *Penalty*, Black's Law Dictionary (11th ed. 2019) (defining penalty as "[a]n extra charge against a party who violates a contractual provision").

[108] *S.H. Deliveries*, 1997 WL 817883, at *2; Restatement (Second) of Contracts § 356 cmt. a ("The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy."); Restatement (First) of Contracts § 579 (Am. L. Inst. 1932) ("A bargain for a penalty for the non-performance in the future of a contractual or other duty is illegal."); *see* Restatement (Second) of Contracts § 356; *Del. Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650–51 (Del. 2006) (evaluating whether a contractual provision requiring a $25,000 payment if either party terminated the contract early would be invalid if a penalty, but enforceable if a liquidated damages provision).

But when contractual damages are difficult to estimate, parties to a contract may stipulate that a fixed amount should be paid upon a breach. If valid, these provisions are known as liquidated damages provisions; if they are not, they are penalties. A damages provision will be a valid liquidated damages provision rather than an invalid penalty if: (1) the damages that would flow from a future breach are difficult to estimate because they are indefinite or uncertain, and (2) at the time the contract was entered into, the agreed-upon amount was a reasonable estimate of the damages suffered.[109] Liquidated damages provisions are presumptively valid and will be enforced unless the breaching party can demonstrate that the provision fails to meet this standard.[110]

In the partnership setting, the common law disfavor of penalties yields to statute. Section 17-306 of the Limited Partnership Act, titled "Remedies for Breach of Partnership Agreement by Limited Partner," permits a partnership agreement to specify "penalties."[111] It states "[a] partnership agreement may provide that: (1) A limited partner who fails to perform in accordance with, or to comply with the terms and conditions of, the partnership agreement shall be subject to specified penalties

[109] *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 48 (Del. 1997) (citing *Lee Builders v. Wells*, 103 A.2d 918, 919 (Del. Ch. 1954)).

[110] *Unbound P'rs Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1034 (Del. Super. 2021).

[111] 6 *Del. C.* § 17-306.

34

or specified consequences . . . ."[112] Section 17-306 further provides that "[s]uch specified penalties or specified consequences may include and take the form of any penalty or consequence set forth in § 17-502(c) of this title."[113] Section 17-502(c) lists "reducing or eliminating the defaulting partner's proportionate interest in the limited partnership," and "forfeiture of that partnership interest" as two potential consequences.[114] This Court has explained that 6 *Del. C.* § 18-306 which mirrors Section 17-306, departs from the common law in that it "authorizes LLC agreements to provide for remedies that would be unavailable in a standard commercial contract, most notably penalties and forfeitures."[115]

The enforceability of a penalty or liquidated damages provision depends on the enforceability of the underlying promise that was breached.[116] If, for example,

---

[112] *Id.*

[113] *Id.*

[114] *Id.* § 17-502(c).

[115] *XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 661–62 (Del. Ch. 2022) (citations omitted); *see also CML V, LLC v. Bax*, 6 A.3d 238, 251 (Del. Ch. 2010) (reasoning that Section 18-306 represents a departure from the common law rule against penalties); *cf. Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 n.33 (Del. Ch. Apr. 20, 2009) ("[W]hen addressing an LLC case and lacking authority interpreting the LLC Act, this court often looks for help by analogy to the law of limited partnerships." (collecting authorities)); *see also In re Cellular Tel. P'ship Litig.*, 2021 WL 4438046, at *73 & n.58 (Del. Ch. Sept. 28, 2021) (discussing similar provisions in the general partnership context).

[116] *See Geronta Funding*, 284 A.3d at 68 (quoting Restatement (Second) of Contracts § 197); *Brazen*, 695 A.2d at 47 ("[L]iquidated damages, by definition, are damages paid in the event of a breach of a contract.").

35

that promise is an unenforceable restrictive covenant, the liquidated damages provision is unenforceable.[117]

With that Delaware primer on restrictive covenants, forfeitures and conditions, and liquidated damages provisions and penalties at common law and in the partnership setting, I turn to the appropriate labels to ascribe to the Conditioned Payment Device.

### B. The Conditioned Payment Device Comprises Two Conditions To The Payment Of Conditioned Amounts.

I interpret Article XI to provide that the Conditioned Payment Device conditions Cantor Fitzgerald's duty to pay Conditioned Amounts on two conditions precedent: (1) not engaging in any Competitive Activity (the Competitive Activity Condition) and (2) not breaching any Partner Obligation (the No Breach Condition). I begin with the more straightforward language of the Conditioned Payment

___

[117] *See Bhaskar S. Palekar, M.D., P.A. v. Batra*, 2010 WL 2501517, at *5 (Del. Super. May 18, 2010) ("Paragraph 4(c) contains a restrictive covenant and $200,000 in liquidated damages. In order to enforce them, the Court must determine that both are proper."). In cases in which a physician is purportedly subject to a restrictive covenant, a Delaware statute eliminates the availability of injunctive relief but permits enforcement by a liquidated damages provision. 6 *Del. C.* § 2707; *see, e.g.*, *Saez v. Nephrology Assocs.*, 2019 WL 5207918, at *3, *7 (Del. Super. Oct. 16, 2019). At first glance, the statute and common law may appear to contemplate a liquidated damages provision enforcing an otherwise enforceable promise. I read the statute to strike only the availability of injunctive relief, leaving the Restrictive Covenant as a promise enforceable by liquidated damages only.

Device's sections addressing the Grant Amounts, which include only the Competitive Activity Condition.

Each such section governing the payment of Grant Amounts contains substantively identical language stating that a partner will be entitled to certain post-termination payments "*provided* that . . . such Partner has not engaged in any Competitive Activity prior to the date such payments are due."[118] The use of the language "provided" is strong evidence that the parties intended to create a condition.[119] The plain language of the provision explains that if a partner has not engaged in a Competitive Activity before the date each Grant Amount payment is due, Cantor Fitzgerald has a duty to make those payments. In other words, Cantor Fitzgerald had no duty to pay any upcoming Grant Amount installment until the payment due date arrives and the partner has not engaged in any Competitive Activity. The Competitive Activity Condition must be satisfied before Cantor Fitzgerald's obligation to pay Grant Amounts arises. Thus, it is a condition precedent.[120]

---

[118] LP Agr. §§ 11.08(b); 11.09(b), 11.10(b).

[119] *See supra* note 94.

[120] *See AB Stable*, 2020 WL 7024929, at *49–50; Restatement (Second) of Contracts § 224 cmt. e.

37

Reading the LP Agreement as a whole supports this conclusion. Section 11.02(d) states that nothing in Article XI limits a partner's ability to compete or otherwise obtain employment.[121]  This reiterates that Article XI itself imposes no duty on withdrawing partners to refrain from engaging in Competitive Activities; Article XI does not create a promise or covenant, so engaging in Competitive Activity is not a breach of Article XI.[122]  Rather, engaging in such activity prevents Cantor Fitzgerald's duty to pay the Grant Amounts from arising.[123]

Having established that Article XI's phrase "provided that such Partner has not engaged in any Competitive Activity" creates a condition precedent, I turn to Section 11.04(a), which states that "a Partner will be entitled to receive payment of one-fourth of such Partner's Additional Amounts . . . ; *provided*, that such Partner . . . has not engaged in any Competitive Activity or otherwise breached a Partner Obligation prior to the date such payment is due."[124]  The first part of this language reincorporates the Competitive Activity Condition.  It also adds a disjunctive second condition:  "or otherwise breached a Partner Obligation."  The same textual reasons

---

[121] LP Agr. § 11.02(c).

[122] Of course, during the Restricted Period, Section 3.05 imposes a duty on departing partners not to engage in Competitive Activity.

[123] *See, e.g.*, *Williston on Contracts* § 38:7 (explaining that where parties have created a condition, the fulfillment of that condition is necessary to give rise to the duty to perform).

[124] LP Agr. § 11.04(a) (emphasis in original).

reflect the express intent to condition Cantor Fitzgerald's duty to pay Additional Amounts on the payment due date arriving without any breach of a Partner Obligation. The fact that the No Breach Condition is triggered by a "breach[ of] a Partner Obligation" does not prevent it from being a condition—an agreement can create a condition that is triggered by a failure to perform a contractual duty.[125] I interpret Section 11.04(a) to condition Cantor Fitzgerald's duty to pay Additional Amounts on the due date arriving without any breach of the Partner Obligations. Like the Competitive Activity Condition, this No Breach Condition is a condition precedent.[126]

### C. Plaintiffs' Structural Attacks On The Conditioned Payment Device Fail.

In seeking to prevail on summary judgment, Plaintiffs lodge two attacks on both conditions. First, they assert that Section 3.05(b) and the No Breach Condition are penalties, and that they deserve a summary judgment because penalties are

---

[125] *See* Restatement (Second) of Contracts § 227 cmt. d ("When an obligor wants the obligee to do an act, the obligor may make his own duty conditional on the obligee doing it and may also have the obligee promise to do it."); *Williston on Contracts* § 38:15 ("A provision may be both a condition and a promise if one of the parties, as part of its bargain and in addition to the other promises it makes, agrees to ensure that the condition will occur . . . ."); *see also* Restatement (Second) of Contracts § 225(3) ("Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur."); *Sechrist Indus.*, 2002 WL 31260989, at *7 (same).

[126] *See AB Stable*, 2020 WL 7024929, at *49–50; Restatement (Second) of Contracts § 224 cmt. e.

unenforceable under Delaware law.[127]   But as explained, Delaware law permits

penalties for breaches of a partnership agreement.  Even if the No Breach Condition

were a penalty for breach of a partnership agreement, it would not be invalid simply

because it imposes a penalty.

Second, Plaintiffs argue the Competitive Activity Condition and the No

Breach Condition cannot prevent any duty from arising because Cantor Fitzgerald

has not demonstrated that either condition is material.[128]  This argument reflects a

misunderstanding of conditions.  A condition represents a contractual agreement that

something less than a material breach will prevent the duty to perform from arising

or extinguish an existing duty to perform.[129]  To require that the condition be material

would undermine the very purpose of including such conditions in contracts, and our

---

[127] PCB at 31–35 (relying on *Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 585 (6th Cir. 2021) (applying Ohio law)).

[128] PRB at 21.

[129] *See supra* note 89.

law imposes no such requirement.[130]  Plaintiffs' cited cases do not compel a

conclusion to the contrary.[131]

---

[130] *Akorn,* 2018 WL 4719347, at *85 (explaining that conditions "depart from the common law doctrine of material breach" in that they excuse performance absent a material breach (citing Restatement (Second) of Contracts § 241 cmt. a); *Farnsworth on Contracts* § 8.02, at 8-6 ("Although a condition is usually an event of significance to the obligor, this need not be the case.  In exercising their freedom of contract the parties are not fettered by any test of materiality or reasonableness.  If they agree, they can make even an apparently insignificant event a condition."); Restatement (Second) of Contracts § 241 cmt. a (providing standard for finding nonperformance was material, and contrasting this standard with the nonoccurrence of a condition, which does not require materiality); *see also Williston on Contracts* § 38:6 ("[I]f a party makes a promise to do an act on condition that it will receive $5.01, it cannot be required to perform on being paid $5."); Restatement (Second) of Contracts § 229  (providing rule for where nonoccurrence of a condition would otherwise excuse performance, and in those circumstances stating the court has the discretion to excuse the occurrence or nonoccurrence of the condition).

[131] First, in *SLMSoft.com, Inc. v. Cross Country Bank*, the Superior Court found that the contract did not create a condition, rendering any discussion of the materiality of a covenant dicta.  2003 WL 1769770, at *12–13.  Further, it is not clear that the court's passing reference to materiality—in a footnote and not accompanied by legal support—supports the position that only a failure of a material condition relieves the duty to perform.  *See id.* at *5 n.22.  Second, *Merchantwired, LLC v. Transaction Network Services, Inc.* described some conditions precedent as material, but did not rely on that characterization in reading the complaint to fall short of alleging that "all conditions precedent" were satisfied.  2003 WL 21689647, at *2 (Del. Super. July 16, 2003).  Third, in *Ewell v. Lloyd's*, while the parties joined issue over the materiality of the condition as a gating concept, the Superior Court acknowledged that materiality instead informs whether a court may excuse a condition in certain circumstances.  2010 WL 3447570, at *6 (Del. Super. Aug. 27, 2010) (quoting Restatement (Second) of Contracts § 229); *see also Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *8 & n.76 (Del. Ch. Apr. 22, 2021) (considering *Ewell* and concluding "'materiality' of a condition precedent" plays no role in implementing an express condition that does not work an inequitable forfeiture).  Finally, in *Akorn,*, the relevant agreement included a provision that required the nonoccurrence of any condition precedent or occurrence of any condition subsequent to be material.  2018 WL 4719347, at *86.

### D. The No Breach Condition Is Predicated On An Unenforceable Promise.

Cantor Fitzgerald has urged the Court to label the Competitive Activity Device as a condition because, it argues, doing so divorces the withholding of Conditioned Amounts from the Restrictive Covenants, and so this Court has no basis to review the Restrictive Covenants for reasonableness. As explained, I agree that both the No Breach Condition and the Competitive Activity Condition are conditions precedent. I disagree that labeling them as such saves the underlying Restrictive Covenants from scrutiny.

The No Breach Condition is triggered by a breach of Section 3.05's Restrictive Covenants. Its plain language provides that the condition will not be fulfilled if a partner "breache[s]."[132] In order for an action to breach a restrictive covenant, that restrictive covenant must be enforceable.[133] If the restrictive covenant is not enforceable, that action is not a breach. If the Restrictive Covenants are not enforceable, then Plaintiffs cannot have breached a Partner Obligation; if Plaintiffs have not breached a Partner Obligation, then they have not triggered the No Breach Condition. Plaintiffs' challenge of the Restrictive Covenants therefore has traction even in the context of the No Breach Condition operating as a condition triggered

---

[132] LP Agr. § 11.04(a).

[133] *See, e.g.*, *Batra*, 2010 WL 2501517, at *5.

42

by a breach, rather than a remedy for breach. Thus, I must evaluate whether the Restrictive Covenants are enforceable under Delaware law.

For the Restrictive Covenants to be enforceable under Delaware law, they must (1) be "reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[134] The reasonableness of the covenant's scope is measured in relation to the employer's legitimate interests: a greater scope must be supported by a greater interest.[135]

Section 3.05 imposes a variety of restrictions on competing and soliciting customers and employees. Five provisions prohibit, among other things, soliciting Cantor Fitzgerald employees and partners, soliciting customers, doing business with

---

[134] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (internal quotation marks omitted) (quoting *Wilson*, 2018 WL 4677606, at *5).

[135] *See id.* at *7 ("Given the vast geographic scope of the non-compete, [the former employer] must demonstrate it is protecting a particularly strong economic interest to persuade the Court that the non-compete is enforceable."); *Kodiak*, 2022 WL 5240507, at *1 ("[T]he restrictive covenants protecting all the plaintiff's business lines are unenforceable because they are broader than the plaintiff's legitimate business interest in the purchased assets"); *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *4 (Del. Ch. Mar. 5, 1998) ("The scope of a restrictive covenant must be tailored to protect Norton's legitimate business interests and must be balanced against the hardship it will pose to the Defendant."); *see also Cabela's LLC v. Wellman*, 2018 WL 5309954, at *14 (Del. Ch. Oct. 26, 2018) (applying Nebraska law) ("By seeking to enforce the terms of those provisions, Cabela's has not exceeded the scope of its legitimate business interests."); *cf. Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) ("The relief that RTC has requested (that the defendants be enjoined from dealing with a list of key RTC customers) is no broader than necessary to protect [its] interests.").

Cantor Fitzgerald customers, and obtaining employment with any business defined as a "Competing Business."[136] The restrictions on soliciting employees and customers last for two years, while the balance of the restrictions last for one.[137] The Restrictive Covenants cover the business of Cantor Fitzgerald, as well as any "limited and general partnerships, corporations or other entities owned, controlled by or under common control with the partnership."[138] There is no geographic limitation on any restriction. Per the terms of Section 3.05, a partner has breached these covenants if the Managing General Partner determines, in good faith, that such a breach has occurred.[139] Cantor Fitzgerald contends that the breadth of Competitive Activity advances its legitimate economic interests because it protects its "business good will and customer relationships."[140]

---

[136] *See* LP Agr. § 3.05(a) (stating each partner "agrees that . . . he, she or it . . . agrees during the Restricted Period not to, either directly or indirectly" breach any Partner Obligation); *id.* § 11.04(c)(A) (inducing, influencing, or attempting "to solicit, induce or influence" partners, employees and consultants from leaving Cantor Fitzgerald); *id.* § 11.04(c)(B) (soliciting customers); *id.* § 11.04(c)(C) (doing business with any Cantor Fitzgerald customer and certain former customers); *id.* § 11.04(c)(D) (directly or indirectly engaging in or otherwise being connected to a Competing Business); *id.* § 11.04(c)(E) (assisting others in "engaging in any Competing Business").

[137] *Id.* § 1.01 (defining "Restricted Period").

[138] *Id.* (defining "Affiliated Entities"); *id.* § 11.04(c)(A)–(E) (defining "Competitive Activity" to include "Affiliated Entities").

[139] *Id.* § 3.05(a)(vi).

[140] DOB at 42. To be sure, Cantor Fitzgerald focuses its argument on the definition of Competitive Activity in Article XI, which Section 3.05 relies on. I read these arguments to also encompass the enforceability of Section 3.05's restrictive covenants.

As an initial matter, Cantor Fitzgerald suggests the scope of Competitive Activities should avoid reasonableness review because "Plaintiffs agreed when they executed the Partnership Agreement that Article XI protects legitimate economic interests of the Partnership" and that they agreed the provisions were "reasonable in scope and duration and are necessary to protect the interests of the Partnership and the Affiliated Entities."[141]  But the fact Plaintiffs signed an agreement stipulating to its own reasonableness does not insulate that agreement from a reasonableness review under Delaware law.[142]  Similarly, the fact that Plaintiffs signed an agreement stating that unenforceable terms shall be revised does not make this Court inclined to blue-pencil those terms.[143]

The Restrictive Covenants' worldwide geographic scope is unreasonable. "[T]he absence of a geographic limitation does not render [a] restrictive covenant unenforceable *per se*":  it can be enforceable if the restriction is narrowly tailored to serve the employer's interests in the circumstances of the case.[144]  But Cantor

---

[141] *Id.* at 42–43 (internal quotation marks omitted) (quoting LP Agr. § 11.04(e)).

[142] *See Kodiak*, 2022 WL 5240507, at *5–7 (rejecting on public policy grounds the argument that contractual language agreeing that noncompete provisions were reasonable precluded the Court from reviewing it for reasonableness).

[143] *See id.*; *id.* at *4 n.49.

[144] *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002) (internal quotation marks omitted) (quoting *Gas Oil Prod., Inc. of Del. v. Kabino*, 1987 WL 18432, at *2 (Del. Ch. Oct. 13, 1987)).

Fitzgerald makes only the conclusory argument that Cantor Fitzgerald is a global

business and therefore a global restrictive covenant is necessary. This is not

sufficient.[145]

---

[145] *See Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (stating "the scope and duration of the Restrictive Covenants are reasonable under the circumstances of this case" and considering the "nature of the industry" and "the depth of [the defendant's] knowledge of [the former employer's] business practices"); *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011) ("A non-compete covenant will be enforced only over a geographical area reasonable under the circumstances."); *Comput. Aid, Inc. v. MacDowell*, 2001 WL 877553, at *4 (Del. Ch. July 26, 2001) (referring to the geographic and temporal scope inquiries as "fact-specific"); *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987) ("[E]ach [restrictive covenant] case requires a careful evaluation of the specific facts and circumstances presented."); *Pfuhl*, 1992 WL 345465, at *11 ("A non-competition agreement will only be enforced over a geographic area that is reasonable under the circumstances."); *see also Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018) ("This Court has previously held that it 'may, in the appropriate circumstances, enforce an agreement without express territorial scope.' This is particularly true when an employer's non-compete agreement prohibits an employee from engaging in activity that is 'in competition with' the employer's business, as opposed to prohibiting activity that is 'similar to' that business." (footnote omitted) (quoting *Del. Exp. Shuttle*, 2002 WL 31458243, at *12–13); *Del. Exp. Shuttle,* 2002 WL 31458243, at *12 ("[T]he Court may, *in the appropriate circumstances*, enforce an agreement without express territorial scope and establish a reasonable geographical limitation where there is none in the Non–Competition Agreement." (emphasis added)). The cases Cantor Fitzgerald cites demonstrate this is true. *See, e.g.*, *Berryman*, 2004 WL 835886, at *10 (enforcing global restrictive covenant where trial testimony "showed that the courier business is a competitive business and that personal contacts are critical to the success or failure of the venture," where the former employee developed contacts "as an employee and officer" of the company, and where he "ha[d] complete knowledge [of the company's] proprietary information, including its business strategies, logistics, and costs").

The Restrictive Covenant is most patently unreasonable in its scope of who it protects. "Competitive Activities" includes prohibited actions taken not just against Cantor Fitzgerald, but also "any Affiliated Entity," defined as "the limited and general partnerships, corporations or other entities owned, controlled by or under common control with" Cantor Fitzgerald.[146] Prohibited solicitation is not limited to successfully convincing a Cantor Fitzgerald partner to withdraw and work for a competitor: it also includes acting in concert with others to attempt to "solicit, induce or influence" a consultant to terminate "other business arrangements" with Cantor Fitzgerald,[147] and inducing a customer or employee of a Cantor Fitzgerald affiliate to "adversely affect their relationship" with an affiliate.[148] Other prohibited activities include assisting others in becoming "connected with[] any Competing Business" of an affiliate[149] and taking "any action that results directly or indirectly in revenues or other benefit for that Limited Partner or any third party that is *or could be considered* to be engaged in such Competitive Activity."[150] Under these

---

[146] LP Agr. § 11.04(c)(A)–(E); *id.* § 1.01 (defining "Affiliated Entities").

[147] *Id.* § 11.04(c)(A).

[148] *Id.* § 11.04(c)(B).

[149] *Id.* § 11.04(c)(D).

[150] *Id.* § 3.05(a)(iii) (emphasis added).

standards, it is highly possible that a partner could unknowingly engage in a Competitive Activity.

A hypothetical illustrates the breadth of these restrictions. A former Cantor Fitzgerald partner who worked as a broker in the Hong Kong office could withdraw from the Partnership, move to Europe, and switch professions by taking a position as an accountant for a large international accounting firm. If that accounting firm provides services for a European-based entity in the "institutional brokerage business," and the Managing General Partner determines that such accounting work "could be considered to be" "assist[ing] others in engaging in" indirectly competing with a Cantor Fitzgerald affiliate, then Cantor Fitzgerald could seek injunctive relief and withhold payment of all Conditioned Amounts.

Cantor Fitzgerald has advanced no convincing rationale as to why this broad and vaguely defined scope is necessary to protect Cantor Fitzgerald's good will and customer relationships. Cantor Fitzgerald has not pointed to any legitimate business interest that could be served by protecting all its unspecified affiliates,[151] and

---

[151] In response to an interrogatory requesting that it identify all "Affiliated Entities," Cantor Fitzgerald claimed the request was both overbroad and unduly burdensome, and then proceeding to list eight entities, which it claimed were "among the 'Affiliated Entities.'" DOB, Ex. 7, at res. 4. That Cantor Fitzgerald believes it is burdensome to list out all entities that partners are prohibited from competing with reflects poorly on the scope of these Restrictive Covenants.

condemning all third parties who are or could be considered to be engaged in Competitive Activity who might indirectly benefit from a former limited partner's work.[152] There is no indication that Plaintiffs had access to any kind of information—proprietary or otherwise—that would warrant that restriction. Cantor Fitzgerald argues only that Plaintiffs have profited from Cantor's other business lines. While this point may be relevant to balancing the equities, it does not constitute a legitimate business purpose for purposes of enforcing noncompetes and nonsolicits that reverberate through Cantor Fitzgerald's affiliates on the one hand, and any third party who might indirectly benefit from a limited partner's work and who might be considered to be a competitor on the other.

Section 3.05's overbreadth is exacerbated by how the LP Agreement defines whether it has been breached. A partner breaches a Restrictive Covenant not when

---

[152] *See Kodiak*, 2022 WL 5240507, at *10 (reasoning that a buyer's interest in the target's goodwill does not extend to other unrelated industries); *Norton Petroleum*, 1998 WL 118198, at *3 ("The evidence unequivocally shows that Norton's sole enterprise is to manufacture and sell lubricants. To that extent, Norton has a legitimate business interest to protect. Norton has no legitimate interest, however, in prohibiting Defendant from selling non-lubricant products. Enforcing such a prohibition would significantly limit Defendant's ability to find suitable employment."); *see also Med. Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 328 (N.C. Ct. App. 2009) ("MSN presented no evidence, and the trial court made no findings that MSN had any legitimate business interest in preventing competition with, foreclosing the solicitation of clients and employees of, and protecting the confidential information of an unrestricted and undefined set of MSN's affiliated companies that engage in business distinct from the medical staffing business in which Ridgway had been employed. We conclude that on its face, this bar extends beyond any legitimate interest MSN might have in this case.").

she actually competes, but when the Managing General Partner determines she has competed. This language expands the scope of prohibited employment from competing to employment that may not actually compete, and therefore not harm any legitimate Cantor Fitzgerald interest, so long as the Managing General Partner believed in good faith that the employment was a Competitive Activity. Cantor has not advanced any argument showing why this expansive condition is necessary.

In view of these broad and vaguely defined provisions, the Restrictive Covenants' temporal scope is unreasonable. Whether the duration of a restrictive covenant is reasonable turns on the specific facts before the Court and the needs of the employer.[153] Cantor Fitzgerald asserts only that "Delaware courts have enforced non-compete restrictions with five and even ten year durations"[154] and that "[f]our years is within the range of reasonable durations in Delaware."[155] That may be true

---

[153] *Deloitte & Touche USA LLP v. Lamela*, 2007 WL 1114075, at *6–10 (Del. Ch. Apr. 6, 2007) (finding two year restrictive covenant reasonable as to some partnership clients but not others, and considering year-over-year revenue derived from each client that the defendant allegedly solicited and the defendant's involvement with each client prior to his departure); *Elite Cleaning*, 2006 WL 1565161, at *8 (finding two year restrictive covenant unenforceable and considering that worker was unskilled and received no specialized training); *RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001) (finding two years unreasonable for non-solicitation agreement for employee home inspection services, and considering bargaining power, that the agreement was a form agreement, and that others were not required to sign the same agreement).

50

for more tailored restrictive covenants, but it is unreasonable to subject withdrawn partners to these Restricted Covenants for the specified Restricted Periods.

Finally, I turn to the balancing of the equities. Some factors weigh in favor of enforcement, including the fact Cantor Fitzgerald is not seeking to prohibit Plaintiffs from obtaining employment, and Plaintiffs did in fact move to other firms or otherwise pursue their livelihoods.[156] Further, Plaintiffs knowingly entered into a contractual arrangement bringing them into the Partnership, fully aware of the Restrictive Covenants and the potential to forgo certain sums in the event they left the Partnership and competed. With that knowledge, five of the six Plaintiffs invested additional funds to acquire HDII Units notwithstanding these provisions. And in this partnership setting, Plaintiffs as partners profited, or at least had the potential to profit, from the enforcement of these provisions against other departing partners. To deny enforcement of the Restrictive Covenants would deny Cantor Fitzgerald and its other partners the benefit of their bargain.[157]

---

[156] *See* DOB, Ex. 10 at res. 9. The parties dispute Kwan's path after leaving Cantor Fitzgerald. DOB at 13 (stating "Kwan joined [a competing entity] in September 2010 and served as Executive Managing Director, Chief Operating Officer, and Director of the Board of [that entity]"); PCB at 15 (stating "Kwan started her own consulting firm . . . and served on the board of directors for [an alleged competitor]"). I make no finding as to whether Kwan accepted employment with Reorient, and my considerations for purposes of the balancing of the equities does not take into account which party's version of the facts is correct.

[157] *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004).

51

But there are also facts that show enforcement would not be equitable here. Plaintiffs stand to lose between $96,651 and $5,492,092.45—a range from meaningful to extraordinary.[158] And Cantor Fitzgerald relied on the determination of its Managing General Partner to withhold those amounts, rather than establishing Plaintiffs actually breached the agreement before a factfinder, which weighs against concluding these restrictions are equitable. The restrictions themselves are so broad that it appears it would be difficult, and so vague that it would be risky, for former Cantor Fitzgerald partners to find employment in or adjacent to the financial services field. On balance, the considerations weighing in favor of enforcement are insufficient to render the Restrictive Covenants reasonable.

Accordingly, I conclude the Restrictive Covenants in Section 3.05(a), specifically the promises not to engage in Competitive Activity for the specified Restricted Periods in Section 3.05(a)(ii) and (iii), are unreasonable and therefore unenforceable.[159] It follows that Plaintiffs' alleged failure to comply with Section 3.05's unenforceable promises cannot constitute the breach of a Partner Obligation.

---

[158] DOB, Ex. 7, at res. 8. The fact that these Plaintiffs obtained employment elsewhere does not necessarily foreclose the Court from considering these penalties' limiting effect on worker mobility. *See* Restatement (Second) of Contracts § 186 cmt. a (stating that in assessing whether a promise is a restraint of trade, "[t]he promise is viewed in terms of the effects that it could have had and not merely what actually occurred.").

[159] For the avoidance of doubt, I find unreasonable Section 3.05's covenants not to engage in any of the Competitive Activities during the Restricted Period.

That breach therefore cannot condition Cantor Fitzgerald's duty to pay the Additional Amounts.

Because the No Breach Condition is an unenforceable basis by which to preclude Cantor Fitzgerald's duty to pay the Additional Amounts from arising, Cantor Fitzgerald is left with only the Competitive Activity Condition as a basis to relieve its duty to pay Additional Amounts and Grant Amounts.

### E. The Competitive Activity Condition Is Unenforceable.

The Competitive Activity Condition functions as what is commonly known as a forfeiture-for-competition provision.[160] Such provisions cause former employees who compete with their former employer to forgo some benefit to which they would have been entitled had they not competed.[161] Delaware law is not clear on whether such provisions are restraints of trade that should be evaluated for reasonableness;[162] other jurisdictions are split.

---

[160] *See, e.g.*, *Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623 (Conn. 2006).

[161] *See, e.g.*, *DeLeo v. Equale & Cirone, LLP*, 184 A.3d 1264, 1276 (Conn. App. 2018).

[162] *W.R. Berkley Corp. v. Hall*, 2005 WL 406348, at *4 (Del. Super. Ct. Feb. 16, 2005) (declining to apply reasonableness standard where former employee was required to repay stock option profits after he competed); *Pollard v. Autotote, Ltd.*, 852 F.2d 67, 70–71 (3d Cir. 1988) (noting absence of controlling state law and predicting Delaware courts would evaluate forfeiture-for-competition provisions for reasonableness); *W. R. Berkley Corp. v. Dunai*, 2021 WL 1751347, at *2 (D. Del. May 4, 2021) (declining to apply reasonableness review to stock clawback); *see also Wark*, 2020 WL 429114; *Halpen*, 2001 WL 985104.

Plaintiffs urge this Court to adopt the framework that evaluates such provisions for reasonableness.[163] At bottom, these decisions subject forfeiture-for-competition provisions to the same policy considerations driving the review of traditional restrictive covenants for reasonableness.[164] Courts that follow this approach reason that such clauses have the same purpose and effect as traditional restrictive covenants, in that they are "designed to deter competition" and have a restraining influence.[165] Their analyses also reflect fairness concerns, including that employees may be required to sign such agreements as a condition of their employment, and whether the agreements are presented on a "take it or leave it" basis.[166]

---

[163] PCB at 19–20; *see, e.g.*, *Deming*, 905 A.2d 623; *Brockley v. Lozier Corp.*, 488 N.W.2d 556 (Neb. 1992); *Cheney v. Automatic Sprinkler Corp. of Am.*, 385 N.E.2d 961, 965 (Mass. 1979).

[164] *See Harris v. Bolin*, 247 N.W.2d 600, 602–03 (Minn. 1976).

[165] *See, e.g.*, *Deming*, 905 A.2d at 637–39 (reasoning that it would "be unduly formalistic . . . to invalidate a covenant not to compete that was in direct restraint of trade, but approve a forfeiture provision that indirectly accomplished the same result"); *Pollard*, 852 F.2d at 71 (reasoning that forfeiture-for-competition provisions "restricts an employee's ability to accept alternate employment"); *Almers v. S.C. Nat. Bank of Charleston.*, 217 S.E.2d 135, 140 (S.C. 1975) ("[T]he covenant not to compete and forfeiture upon competing are but alternative approaches to accomplish the same practical result."); *Johnson v. Country Life Ins. Co.*, 300 N.E.2d 11, 15 (Ill. App. 1973) ("[T]o say that the prospective loss of those commissions does not operate to significantly restrict his right to engage in the pursuit of his occupation following termination of his relationship with the company, and by the same token reduce, if not eliminate competition is, in our view, to divorce the practical application and consequences of the covenant from the hard facts of economic reality.").

[166] *Cheney*, 385 N.E.2d at 965 (considering that agreements involving forfeiture-for-competition provisions of the type before the court "are not arrived at by bargaining

Cantor Fitzgerald takes the opposite position. It argues that Delaware should adopt the "employee choice" doctrine, which provides that courts should not review forfeiture-for-competition provisions for reasonableness so long as the employee voluntarily terminated her employment.[167] The employee choice doctrine is driven by freedom of contract principles, and the idea that one should be bound to the agreements she signs.[168] Those jurisdictions reason that the employee made the decision to leave, and forgoing certain compensation or benefits is a part of that decision.[169] The employee choice doctrine is also built on the fact that the employee

between equals" "[t]he employer normally presents the terms on a 'take it or leave it' basis," and that the employee was given the choice to either "sign or terminate his employment"); *Johnson*, 300 N.E.2d at 15 (reasoning the former employer was withholding compensation it agreed to pay the plaintiff as compensation "for the services he rendered").

[167] *See, e.g.*, *Morris v. Schroder Cap. Mgmt. Int'l*, 7 N.Y.3d 616, 621 (N.Y. 2006) ("An essential element to the [employee choice] doctrine is the employer's 'continued willingness to employ the employee." (quoting *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 48 N.Y.2d 84, 89 (1979)).

[168] *See, e.g.*, *Alco-Columbia Paper Serv., Inc. v. Nash*, 273 So. 2d 630, 634 (La. Ct. App. 1973) ("The forfeiture provision was one of the conditions to which the defendant agreed when he entered the plan. We are convinced that he is bound by it.").

[169] *See Fraser v. Nationwide Mut. Ins. Co.*, 334 F. Supp. 2d 755, 760 (E.D. Pa. 2004) ("Fraser was simply faced with the decision of whether or not to disqualify himself from a monetary benefit. In all likelihood, Fraser made that decision as any rational actor would— by weighing the benefits and losses attributable to each option."); *Swift v. Shop Rite Food Stores, Inc.*, 489 P.2d 881, 882 (N.M. 1971) ("Swift voluntarily joined Shop Rite's profit sharing plan. He did so with full knowledge that the decisions of the committee would be binding upon him. When Swift terminated his employment, he did so voluntarily with full knowledge of the plan's provision against direct or indirect competition within one year thereafter.").

is not actually prohibited from working because the forfeiture clause does not support injunctive relief, like a traditional noncompete.[170] And some decisions view the loss of such payments due to competition as forgoing a supplemental benefit.[171] In this sense, forfeiture-for-competition provisions serve as a financial disincentive,

---

[170] *See James H. Wash. Ins. Agency*, 643 N.E.2d at 150 ("The noncompetition provisions are not unreasonable or in illegal restraint of trade because Washington is not barred from practicing his profession. Rather, he is being denied a reward that is intended only for agents who are loyal to Nationwide."); *Courington v. Birmingham Tr. Nat. Bank*, 347 So. 2d 377, 383 (Ala. 1977) (reasoning the public policy concerns raised by noncompetes are not raised by the forfeiture provision before the court because it "does not involve a restriction upon the employee's entry into a competitive endeavor"); *Swift*, 489 P.2d at 882 ("Nothing in the plan gives Shop Rite the right to enjoin Swift from being employed by a competing business, nor could Swift be civilly liale [sic] to Shop Rite for any breach of covenant. . . ."); *Alldredge v. City Nat. Bank & Tr. Co. of Kan. City*, 468 S.W.2d 1, 4 (Mo. 1971) ("The reasoning is that the former employe [sic] is not prohibited from engaging in such employment or activity, but may do so if he wishes."); *Van Pelt v. Berefco, Inc.*, 208 N.E.2d 858, 865 (Ill. App. Ct. 1965) (embracing employee choice as to retirement plan benefits and reasoning the employee was free to accept employment elsewhere).

[171] *See Dunai*, 2021 WL 1751347, at *2 ("This is not a $200,000 penalty for working for a competitor; it is returning a supplemental benefit for breaching the terms of a bargain."); *Lavey v. Edwards*, 505 P.2d 342, 345 (Or. 1973) ("Most [decisions embracing employee choice as to pension plans] adopt the view that such a provision is not a prohibition on the employee engaging in competitive work, but is 'merely' a denial of his right to participate in the pension plan if he does so engage and that the employee has a 'choice' under which he may decide whether or not to engage in competitive work, which he is 'free' to do even though, as a result, he may risk losing the benefits of a pension plan to which he has contributed nothing.").

rather than a per se bar on obtaining employment with a competitor.[172] Other courts

have stated that employee choice is the majority approach.[173]

Front and center in this debate are the competing policy interests of enforcing

private agreements on one hand,[174] and disfavoring restraints of trade and allowing

[172] *See Capozzi v. Latsha & Capozzi, P.C.*, 797 A.2d 314, 320 (Pa. Super. Ct. 2002) ("Financial-disincentive provisions differ from direct restrictive covenants. They do not impose a blanket or geographical ban on the practice of law nor do they directly prohibit an attorney from representing former clients."); *DeLeo*, 184 A.3d at 1275 (describing forfeiture-for-competition provisions as "to deter competition with the partnership" and noting agreement at issue "imposes a financial disincentive on the plaintiff to deter competition with the partnership"); *James H. Washington Ins. Agency*, 643 N.E.2d at 150; *see also* PCB at 19 (conceding sections 11.04, 11.08, 11.09, and 11.10 contain no prohibition on competition).

[173] *See Deming*, 905 A.2d at 634; *Cheney*, 385 N.E.2d at 964; *Rochester Corp. v. Rochester*, 450 F.2d 118, 122–23 (4th Cir. 1971) ("The strong weight of authority holds that forfeitures for engaging in subsequent competitive employment, included in pension retirement plans, are valid, even though unrestricted in time or geography.").

[174] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 903 (Del. 2021) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntary-undertaken mutual obligations." (quoting *ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.3 (Del. 2014)); *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *1 (Del. Ch. July 23, 2010) ("Delaware law respects contractual freedom and requires parties like the operating member to adhere to the contracts they freely enter."); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059–60 (Del. Ch. 2006) ("[T]here is also a strong American tradition of freedom of contract, and that tradition is especially strong in our State, which prides itself on having commercial laws that are efficient." (footnote omitted)); *State v. Tabasso Homes*, 28 A.2d 248, 252 (Ct. Gen. Sessions 1942) ("We also recognize that freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist."); s*ee also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both.").

individuals to freely pursue their profession of choice, on the other.[175] For

conventional noncompete and nonsolicit agreements, Delaware courts attempt to

balance these interests by enforcing the covenants only to the extent necessary to

protect the employer's legitimate business interests.[176] While Delaware may

"frown[] on" or disfavor restrictive covenants, our law nonetheless recognizes their

validity.[177] This is not out of blind adherence to freedom of contract or the right to

enter into agreements both good and bad; employers have very real interests in

protecting proprietary information or the goodwill of a business they have acquired.

But the interests of encouraging competition and ensuring that individuals are free

to earn a living are also very real. The reasonableness standard permits employers

---

[175] *See Wark*, 2020 WL 429114, at *4 ("[A]s a general principle, unambiguous contracts are enforced as written. There are, however, public policy exceptions to this general rule. One of these exceptions is a policy against oppression in employment contracts." (footnote omitted)); *Elite Cleaning*, 2006 WL 1565161, at *4 ("Delaware courts have favored the public interest of competition in their review of noncompetition agreements."); *Cranston*, 375 A.2d at 468 ("Courts scrutinize carefully all contracts limiting a man's natural right to follow any trade or profession anywhere he pleases and in any lawful manner. But it is just as important to protect the enjoyment of an establishment in trade or profession, which its possessor has built up by his own honest application to every day duty and the faithful performance of the tasks which every day imposes upon the ordinary man. What one creates by his own labor is his." (internal quotation marks omitted) (quoting *Ebbeskotte v. Tyler*, 142 N.E.2d 905, 910 (Ind. 1957)).

[176] *FP UC Hldgs.*, 2020 WL 1492783, at *6 ("When assessing 'reasonableness,' the court focuses on whether the non-compete is 'essential for the protection of the employer's economic interests.'" (quoting *Norton Petroleum*, 1998 WL 118198, at *3)).

[177] *Wark*, 2020 WL 429114, at *4.

to enforce restrictive covenants, but only where the circumstances show it is fair and reasonable to do so.

In determining which approach is more consistent with Delaware law, I look to its treatment of liquidated damages provisions enforcing noncompete and nonsolicit agreements, as distinct from injunctive relief. Delaware has extended its skepticism to such damages provisions, noting they are "particularly suspect as potentially-unreasonable restraints on competition, and on ex-employees' interests in earning a living."[178] In *Faw, Casson & Co., LLP v. Halpen*, an employment agreement provided that the employee defendant was bound by the following clause after his employment ended:

> 1. Employee agrees as follows: (a) To pay an amount or amounts equal to one hundred percent (100%) of the gross fees billed by the company to a particular client over the twelve month period immediately preceding such termination, which was a client of the Company within such period, and which client is served (with the type of services set forth above) by Employee, or any corporation, partnership, firm or other business entity with which Employee is associated as set forth above within three (3) years from such termination of employment.[179]

---

[178] *Id.* at *1; *Faw, Casson & Co., L.L.P. v. Halpen*, 2001 WL 985104, *2–3 (Del. Super. Aug. 7, 2001) (enforcing an employment agreement's provision requiring remittance of fees paid to a new employer if a client of the previous employer moves to the new employer, describing and upholding the provision as both "a restrictive employment covenant and a liquidated damages clause" to the extent tethered to the employee's actions).

[179] *Halpen*, 2001 WL 985104, at *2.

The Superior Court was clear: "This is a restrictive employment covenant and a liquidated damages clause" because "[t]he defendant promised to pay a sum of money when plaintiff's clients followed him. Without the covenant, defendant would be able to service clients elsewhere without an adverse economic impact . . . . This is a restraint that has a noncompetitive effect."[180]

In the next breath, the Superior Court stated, "As the amount is fixed, it imposes liquidated damages."[181] Considering the clause as a liquidated damages provision (as opposed to a penalty), the Superior Court reasoned that if the liquidated damages provision was exercised without heed to whether the employee's actions had actually harmed the former employer, it would create the same undue chilling effect on employment and upward mobility as a restrictive covenant.[182] A liquidated damages provision that is triggered even if the employee has not harmed the former employer "outweighs [the employer's] private expectations," "ha[s] an unlawful *in terrorem* purpose and effect,"[183] and is "unenforceable because 'the restraint in these aspects is not reasonable.'"[184] Judge Stokes equated the review of the liquidated

---

[180] *Id.* at *2 & n.1.

[181] *Id.* at *2 n.1.

[182] *Id.* at *3.

[183] *Id.* at *2–3.

[184] *Wark*, 2020 WL 429114, at *7 (cleaned up) (quoting *Halpen*, 2001 WL 985104, at *2).

damages provision to "equity cases that consider injunctive relief" and reasoned, "[w]ithout considering other interests and connecting [the former employee's] conduct in some fashion with a resulting business loss, this liquidated damages claim would be improper."[185]

This Court has recently embraced *Halpen*'s "sound reasoning" and concluded a liquidated damages provision, viewed apart from a noncompete, "is unreasonable to the extent it purports to impose fixed damages untethered from any act or behavior by the employee beyond that of choosing to work for a competitor—an act for which the employer did not seek relief."[186] Vice Chancellor Glasscock concluded the clause before him was "unenforceable as applied because it does not adequately connect [the employer's] business loss to [the former employee's] conduct" and was "untethered to [the employer's] reasonable interests in preventing competition by ex-employees."[187] The breadth of the provision contributed to his conclusion, in that the employee might be penalized even if her new employer took on the former employer's client through no fault or effort of her own.[188]

---

[185] *Halpen*, 2001 WL 985104, at *3 n.7.

[186] *Wark*, 2020 WL 429114, at *7 (cleaned up).

[187] *Id.*

[188] *Id.*

61

To my mind, it is only a small step to move from a liquidated damages provision requiring a former employee to pay amounts to a former employer if the employee competes, to a forfeiture-for-competition provision excusing the employer from paying amounts if the employee competes. Like liquidated damages provisions based on competition, forfeitures are disfavored because of their potential to cause unjust outcomes.[189] Indeed, there are times when the Court will disregard a condition provision where the resulting forfeiture would be particularly inequitable or against public policy.[190] Forfeitures do not enjoy this Court's contractarian deference.

Whether a forfeiture-for-competition provision will effectively restrain trade or an employee's ability to earn a living will vary by provision and by employee. In some instances, an employee and society's interest in worker mobility may be better

---

[189] *See, e.g.*, *QC Hldgs.*, 2018 WL 4091721, at *6 (explaining that a contractual interpretation finding a condition that would result in a forfeiture was "suspect and disfavored"); *see also supra* note 101.

[190] *See, e.g.*, *Snow Phipps Grp.*, 2021 WL 1714202, at *55 (applying the prevention doctrine to excuse the nonoccurrence of a condition); *Stoltz Realty Co. v. Paul*, 1995 WL 654152, at *9 (Del. Super. Sept. 20, 1995) (declining to read agreement as creating condition precedent because to do so would result in an inequitable forfeiture); *Jefferson Chem. Co.*, 267 A.2d at 637 (refusing to enforce condition precedent where forfeiture would result from a "technical mistake"); *see also* Restatement (Second) of Contracts § 227(1) (explaining that a court should prefer a contractual interpretation that reduces the risk of forfeiture resulting from a condition "unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk."); Restatement (Second) of Contracts § 229 (explaining that "a court may excuse the non-occurrence of" a condition "unless its occurrence was a material part of the agreed exchange").

served by a forfeiture-for-competition provision in lieu of a traditional restrictive covenant that carries the threat of injunctive relief. But forfeiture-for-competition provisions may still meaningfully deter or prevent employees from seeking other employment in a manner that is disproportionate to the employer's interest.[191] In my view, to embrace the employee choice doctrine wholesale would be to turn a blind eye to these concerns that Delaware law has prioritized.[192] Applying the reasonableness standard to forfeiture-for-competition provisions can weed out abusive and harmful forfeiture provisions while still permitting employers to discourage competition insofar as their interests warrant it.

---

[191] *Deming*, 905 A.2d at 637 ("We conclude that the provision in the contract at issue in the present case, under which deferred compensation accrued under the agency security compensation plan is forfeited if the employee engages in a competing business, does not differ meaningfully from a covenant not to compete. The total prohibition against competition, enforced by a forfeiture of accrued benefits, subjecting the employee to an economic loss undoubtedly is designed to deter competition."); *Pollard*, 852 F.2d at 71 (reasoning a forfeiture-for-competition provision "restricts an employee's ability to accept alternative employment").

[192] *Tatom v. Ameritech Corp.*, 305 F.3d 737, 745 (7th Cir. 2002) ("[W]e acknowledged the possibility that an Illinois court might likewise 'pierce the formal wrappings' of a stock option forfeiture provision and deem it the equivalent of an anti-competitive provision."); *Johnson v. Country Life Ins. Co.*, 300 N.E.2d 11, 15 (Ill. App. Ct. 1973) ("[T]o say that the prospective loss of those commissions does not operate to significantly restrict his right to engage in the pursuit of his occupation following termination of his relationship with the company, and by the same token reduce, if not eliminate competition is, in our view, to divorce the practical application and consequences of the covenant from the hard facts of economic reality.").

If Delaware law were amenable to adopting the employee choice doctrine, the LP Agreement is a poor fit for it. The employee choice doctrine operates only where the employee voluntarily terminates her employment, but the Conditioned Payment Device works a forfeiture regardless of the reason a partner ceases to become a partner.[193]

And it is a significant forfeiture: Plaintiffs here stood to lose (and did lose) between nearly $100,000 to just under $5.5 million. These amounts are not tethered to any competition that actually harms Cantor Fitzgerald: they are tethered to the partner's capital contributions and earned compensation. And, as explained, the breadth of "Competitive Activity" makes it possible, if not likely, that a former partner will engage in it accidentally or unknowingly. Delaware law is clear that imposing financial consequences on former employees for competitive circumstances that are not their fault, and in an amount that is untethered to the former employer's loss, has an *in terrorem* effect and operates as an unreasonable restraint of trade.[194]

---

[193] LP Agr. § 11.04(c); *see, e.g.*, *Morris*, 7 N.Y.3d at 621 ("An essential element to the doctrine is the employer's 'continued willingness to employ' the employee. Where the employer terminates the employment relationship without cause, 'his action necessarily destroys the mutuality of obligation on which the covenant rests as well as the employer's ability to impose a forfeiture.'" (citation omitted)). Plaintiffs here did leave voluntarily.

[194] *Halpen*, 2001 WL 985104, at *2; *Wark*, 2020 WL 429114, at *1, *7.

The Competitive Activity Condition is intended to dissuade partners from competing: it states that partners will suffer a forfeiture if they "engage[] in any Competitive Activity," which pulls in the same exact conduct as the Restrictive Covenants.[195] And Plaintiffs did not have the opportunity to negotiate any aspect of the LP Agreement: it was provided on a take-it-or-leave-it basis as a condition of joining the Partnership.[196]

And so, I believe Delaware's emphasis on balancing an employer's ability to contractually protect its good will, confidential information, customers, and other assets against the public policy favoring free competition and employee mobility, and Delaware's distaste for liquidated damages provisions that restrain trade by requiring employees to pay former employers if they compete—even unknowingly and in an amount untethered to the employer's loss—supports joining the ranks of jurisdictions that review forfeiture-for-competition provisions for reasonableness as restraints on trade. I also believe that the fact that partners are is still free to compete justifies scaling the review back to the more lenient or employer-friendly review Delaware affords restrictive covenants in the sale of a business as compared to an

---

[195] *See,* LP Agr. § 11.04(a).

[196] The LP Agreement is a form agreement, and each Plaintiff signed an identical version.

employment agreement.[197]  I will evaluate whether the Competitive Activity Condition is reasonable under that standard.[198]

Even under this more lenient standard, nearly all of the reasons I offered above for concluding the Restrictive Covenants are unreasonable apply.[199]  The Competitive Activity Condition is more reasonable than the Restrictive Covenants in two respects:  the scope of prohibited activity is narrower,[200] and the condition

---

[197] *See, e.g.*, *Berryman*, 2004 WL 835886, at *10.

[198] In coming to this conclusion, I am mindful of Section 11.02(c)'s language that "Nothing in this Article XI shall be considered or interpreted as restricting the ability of a former Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever."  LP Agr. § 11.02(c).  This does not compel a different decision.  First, I have already read the language as having independent significance in that it clarified the provisions in Article XI do not reflect additional promises by partners.  Second, this language could not otherwise preclude a reasonableness review as parties cannot stipulate that a restrictive covenant does not violate public policy.  *See Kodiak*, 2022 WL 5240507, at *5–7.

[199] Cantor Fitzgerald makes the conclusory argument that contingent payments enjoy some latitude under the Limited Partnership Act, specifically Sections 17-306 and 17-502, that they do not under common law.  Those sections permit partnership agreements to impose penalties (not otherwise permissible under the common law) and other consequences for failure to comply with a limited partnership agreement.  *See* 6 *Del. C.* §§ 17-306, 17-502.  While Cantor Fitzgerald points out this distinction, it offers no reason to treat forfeiture-for-competition provisions in a partnership agreement differently than in the typical employment agreement.  DCB at 9–10.  And I read Section 17-306's leniency to stop short of consequences to conditions precedent, like the Competitive Activity Condition, which informs Cantor Fitzgerald's duty but imposes none on the partner.  Even the most generous reading of the statute covers only consequences flowing from a limited partner's breaches and failures to "comply" with a condition, i.e., a condition that imposes some obligation on that partner. 6 *Del. C.* § 17-306(1); *see also id.* § 17-306(2) (addressing consequences from "the happening of events" but not the nonoccurrence of an event).

[200] Specifically, the definition of Competitive Activity does not include "tak[ing] any action that results directly or indirectly in revenues or other benefit for that Limited Partner or any

66

does not delegate the conclusion of whether a partner engaged in a Competitive Activity to the Managing General Partner. But the Competitive Activity Condition effectively restrains former partners for at least two years longer. And the additional years compound a one- to two-year Restricted Period: Cantor Fitzgerald's departed partners are free to compete and solicit subject to forfeiture only after a period of being forbidden from doing so. Cantor Fitzgerald has advanced no compelling interest that could justify the breadth of this forfeiture. Nearly any legitimate interest it had in the scope of the Restrictive Covenants in years one and two is stale by years three and four. I conclude the Competitive Activity Condition as a forfeiture-for-competition provision is unenforceable as an unreasonable restraint of trade. Thus, Cantor Fitzgerald may not rely on the Competitive Activity Condition to withhold any Additional Amounts or Grant Amounts.

### F. Ainslie Is Not Entitled To His Base Amount Because He Failed To Sign A Release.

Cantor Fitzgerald seeks a summary judgment on the issue of whether Plaintiff Ainslie is entitled to his Base Amount because of his failure to sign a release.[201] Cantor Fitzgerald's position is straightforward: The LP Agreement expressly

---

third party that is or could be considered to be engaged in such Competitive Activity." *Compare* LP Agr. § 3.05(a)(iii), *with id.* § 11.04(c).

[201] DOB at 31.

67

permits Cantor Fitzgerald's Managing General Partner to request releases in connection with the payment of a withdrawing partner's Base Amount, and Ainslie declined to sign the release he was sent. LP Agreement Section 11.12 provides as follows:

> The Managing General Partner, in its sole and absolute discretion, may condition the payment of any amounts due to a Partner under this Article XI upon obtaining a release from such Partner and its Affiliates in a form and substance satisfactory to the Managing General Partner from all claims against the Partnership other than claims for payment pursuant to and in accordance with the terms of this Article XI.[202]

After departing Cantor Fitzgerald, Ainslie was involved in ongoing litigation with Cantor Fitzgerald Hong Kong.[203] On August 24, 2011, an assistant general counsel for Cantor Fitzgerald sent Ainslie a release in connection with the payment of Ainslie's Base Amount, which purported to release any claims Ainslie had against Cantor Fitzgerald and would set off amounts he allegedly owed Cantor Fitzgerald pursuant to Section 2.02(c) of the LP Agreement.[204] To date, Ainslie has not signed that release, and Cantor Fitzgerald has not paid him his Base Amount.[205]

---

[202] LP Agr. § 11.12.

[203] PCB at 35–36, 57.

[204] *See* DOB, Ex. 19, at RF_0008806; *see also* LP Agr. § 2.02(c).

[205] *See* PCB at 57–58; DOB, Ex. 7, at res. 8.

68

Ainslie argues that Cantor Fitzgerald is not entitled to summary judgment on this issue because it requested the release while he was in the midst of ongoing litigation against Cantor Fitzgerald Hong Kong.[206] Ainslie argues that in those circumstances, his failure to sign the release should not preclude him from receiving his Base Amount.[207] Ainslie offers no legal support for this position, making no effort to explain how it relieves him of the plain, unambiguous terms of the LP Agreement. I grant Cantor Fitzgerald's motion for summary judgment on this issue.[208]

---

[206] PCB at 57.

[207] PCB at 56–58. I understand Ainslie to be contending that the language releasing claims against "[Cantor Fitzgerald], and all successors and assigns" would somehow impede his defensive position (which I do not believe included any counterclaims) against Cantor Fitzgerald Hong Kong.

[208] Ainslie also argues that "the Court should declare in conjunction with the resolution of this matter that 'if the release is signed, and once executed, the compensation must be paid' rather than finding Ainslie is not entitled to his Base Amount." *Id.* at 57. Ainslie has not signed the release, rendering this request unripe. *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1211 (Del. 2014) (declining to resolve issue where "it has not yet assumed a concrete or final form," reasoning "judicial resolution at this stage would necessarily be based on speculation and hypothetical facts, and ultimately could prove unnecessary"). Moreover, the Amended Complaint does not plead such a claim for a declaratory judgment, which is a separate ground to deny this request. *See CALPERS v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) ("Arguments in briefs do not serve to amend the pleadings.").

Finally, Plaintiffs brief an argument that Cantor Fitzgerald is precluded from asserting the anticompetition clauses against Ainslie, as well as certain issues of fact. PCB at 35–42. None of these issues pertain to Cantor Fitzgerald's release, and the release is a ground for withholding the Base Amount independent from the "anticompetition clauses" Plaintiffs briefed. I do not reach these arguments.

### G. Plaintiffs Are Entitled To Partial Judgment On Their Declaratory Judgment Claims, And Judgment On Their Breach Of Contract Claims.

The Amended Complaint includes six claims seeking declaratory judgments, one on behalf of each Plaintiff.[209] Each claim seeks two forms of declaratory relief: (1) a statement of the amounts owed to each Plaintiff under the LP Agreement, and (2) that "the four-year noncompete provision imposed by the Partnership Agreement is not appropriately limited time or space, fails to protect a legitimate interest of CFLP, and is oppressive, thus rendering it unenforceable in its entirety."[210] Cantor Fitzgerald opposes these claims on the grounds that they are duplicative of Counts 1 through 6, moot, and that the Conditioned Payment Device is not a non-compete or restrictive covenant.

Counts 7 through 12 are not duplicative of Counts 1 through 6. Claims are not duplicative where they would require either different proof of provide for a different scope of relief.[211] Counts 7 through 12 seek to invalidate the provisions pursuant to which Plaintiffs' post-termination payments were withheld, as well as a declaration as to the amounts owed to each Plaintiff. To prevail on these counts,

---

[209] Am. Compl. ¶¶ 74–93.

[210] *Id.*

[211] *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at \*16 (Del. Ch. Aug. 28, 2012).

70

Plaintiffs necessarily must establish different elements and meet different standards than their breach of contract claims.

Cantor Fitzgerald argues Plaintiffs' declaratory judgment claims are moot because any restrictions in Article XI expired years ago.[212] "Under the mootness doctrine, 'although there may have been a justiciable controversy at the time the litigation was commenced, the action will be dismissed if that controversy ceases to exist.'"[213] "A proceeding may become moot if the legal issue in dispute is no longer amenable to a judicial resolution."[214] But as demonstrated above, the validity of Article XI's restraints directly informs the dispute over whether Plaintiffs are owed any Conditioned Amounts under the LP Agreement. Plaintiffs' declaratory judgment claims are not moot.

Because I have found that Plaintiffs have prevailed on Counts 7 through 12 by striking the Conditioned Payment Device as an unreasonable restraint built on unreasonable restrictive covenants, the conditions in the Conditioned Payment Device did not operate to preclude Cantor Fitzgerald's duty to make those payments from arising. Cantor Fitzgerald did not make those payments when they became

---

[212] DOB at 37.

[213] *Am. Littoral Soc., Inc. v. Bernie's Conchs*, LLC, 954 A.2d 909 (Del. 2008) (quoting *Gen. Motors Corp. v. New Castle Cnty.*, 701 A.2d 819, 823 (Del. 1997)).

[214] *Id.*

71

due, and so it has breached the LP Agreement. Thus, Plaintiffs also prevail on Claims 1 through 6.

The principal amounts owed appear undisputed.[215] Plaintiffs are entitled to a declaratory judgment that they are owed the "Additional Amount" and "Grants" Cantor Fitzgerald set forth in Cantor Fitzgerald's interrogatory responses.[216]

## III.  CONCLUSION

For the forgoing reasons, Cantor Fitzgerald's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** The parties shall submit a stipulated implementing order, including a final amount owed with any interest, within twenty days. Counsel shall also advise as to what remains to be done in this matter.

---

[215] Cantor Fitzgerald disputes the fact that any funds are owed, but if they are, the amounts Cantor Fitzgerald supplied in its interrogatory responses appear to be undisputed. PCB at 4 (describing the "amounts CFLP concedes [Plaintiffs] would be owed under the Partnership Agreement"); *id.* at 17 (citing DOB, Ex. 7 at 9–10); *see* Ct. Ch. R. 56(h) (noting that in the absence of an argument of an issue of material fact, cross-motions are the equivalent of a stipulation for decision on the merits based on the record submitted with the motions).

[216] DOB, Ex. 7 at res. 8.